SECURITIES AND EXCHANGE COMMISSION, Plaintiff, Appellee,

v.

James E. MacDONALD, Jr., Defendant, Appellant.

Nos. 81–1356, 81–1513 and 81–1514.

United States Court of Appeals, First Circuit.

Argued Oct. 4, 1982.

Decided Feb. 1, 1983.

Thomas D. Gidley, Providence, R.I., with whom Paul V. Curcio, and Hinckley, Allen, Salisbury & Parsons, Providence, R.I., were on brief, for appellant before panel.*

Harlan W. Penn, S.E.C., Washington, D.C., with whom Paul Gonson, Sol., Edward F. Greene, Gen. Counsel, Michael K. Wolensky, Associate Gen. Counsel, and John P. Sweeney, Asst. Gen. Counsel, Washington, D.C., were on brief, for appellee.*

* See n. 3, post.

Before COFFIN, Chief Judge, ALD-RICH, CAMPBELL, BOWNES and BREY-ER, Circuit Judges.

OPINION EN BANC[1]

BAILEY ALDRICH, Senior Circuit Judge.

In this proceeding brought by the Securities Exchange Commission (SEC), defendant James E. MacDonald, Jr. was ordered by the district court to disgorge profits of $53,012 realized on the purchase and subsequent sale of 9,600 shares of Realty Income Trust (RIT) stock. The court, sitting without jury, found that defendant violated the antifraud provisions of the Securities Exchange Act of 1934, section 10(b), 15 U.S.C. § 78j(b), and SEC Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, by making the purchases without disclosing certain material inside information learned in his capacity as chairman of RIT's board of trustees. Defendant appeals, contending that the court erred in its findings of materiality and scienter; in excluding certain evidence, and in its measurement of the profits to be disgorged. We affirm, except as to the amount.

RIT is a real estate investment trust whose stock is traded on the American Stock Exchange. The present controversy revolves around defendant's knowledge of RIT's acquisition of the Kroger Building, a twenty-five story office building in Cincinnati, Ohio, and its likely negotiation of a profitable long-term lease of vacant space therein to Kenner Products. The basic facts, as found by the court, expressly and impliedly, are briefly as follows.

The land under the Kroger Building had been owned by RIT since 1962. Until December 1975, the building was owned and managed by City Center Development Company. Both the land and the building were subject to a first mortgage to Prudential Insurance Company. Under the terms of its ground lease, City Center was obligated to pay ground rent to RIT and mortgage payments to Prudential, but in 1975 it defaulted on both accounts. To protect its investment and avoid foreclosure, RIT advanced mortgage payments to Prudential, and then, on December 2, 1975, filed suit against City Center seeking reimbursement and the appointment of a receiver. The suit was publicly announced on December 4. On December 12, the case was settled by City Center's surrendering to RIT ownership of the Kroger Building. The news of the settlement was reported in a local Cincinnati paper but was not otherwise made available to the investing public. That day, however, RIT did release its quarterly financial report, which, basically, contained nothing but bad news.

Meanwhile, Kenner Products had been looking for a new home, its previous one having been acquired by the city. A tentative decision was made to move into the Kroger Building, and negotiations between City Center and Kenner ensued. After its acquisition of the building, RIT took over the negotiations. A report on the proposed terms of the lease was made to the trustees, including defendant, on December 15. The next day his wife, acting in his behalf,[2] put in an order with her broker for the purchase of up to 20,000 shares of RIT stock at a price of 4¼. One hundred shares were purchased at that price. On December 23, defendant went personally to the broker's office and raised the purchase limit to $5 per share. This resulted in the purchase of 9,500 shares that day at 4⅝.

The following day, December 24, RIT issued a press release, publicly announcing for the first time the acquisition of the Kroger Building, and referring to Kenner, that

"the Trust expects to sign a lease almost immediately for 105,000 square feet of

---

1. Strictly, the first portion of this opinion is the panel's. *See* n. 3, post.

2. As a sanction for defendant's failure to comply with discovery requests concerning the source of funds used to purchase the RIT stock, it was conclusively established that the purchases were made with joint funds of defendant and his wife for their joint benefit. F.R. Civ.P. 37(b)(2)(A). Defendant has not challenged this sanction on appeal.

space in the building with a major new tenant. The lease will bring occupancy in the building up to 95%, which would indicate a market value of the building of approximately $8,500,000 which is approximately $2,000,000 more than the existing first mortgage and RIT's investment in the property."

The price of RIT stock then jumped from 4⅝ to 5½ in two days of trading—a rise of 19%—and closed the year at 5¾. Defendant held on to the stock until 1977 when it was sold at an average price of over $10 per share.

*Materiality*

Defendant first asserts that the court applied an erroneous legal standard in determining the materiality of the insider information. The proper standard for determining whether an omitted fact was material in a Rule 10b–5 case is the same as that formulated by the Supreme Court in *TSC Industries, Inc. v. Northway, Inc.,* 1976, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757, a proxy-dispute case, namely, whether there is "a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of a reasonable shareholder." *Id.* at 449, 96 S.Ct. at 2132; *Harkavy v. Apparel Industries, Inc.,* 2 Cir., 1978, 571 F.2d 737, 741 & n. 5; *Holmes v. Bateson,* 1 Cir., 1978, 583 F.2d 542, 558 & n. 20. This is the precise standard applied by the district court, which found that the inside information "would have assumed actual significance in the deliberations of a reasonable shareholder." Defendant nevertheless claims error based on the court's stating, later in its oral opinion, that "any shareholder who did not have the insider information ... would be suffering from some kind of a feeling of depression, as far as that stock was concerned, and that that depression, *might be* substantially altered by the information that was available ...." (Emphasis added). This isolated statement in no manner suggests that the court applied the wrong legal standard. While the Court in *TSC Industries,* ante, stressed that materiality depends upon what a reasonable shareholder would, not might, consider important, at the same time it noted that it is not necessary to show that the undisclosed information would have been sufficient to alter the shareholder's decision; it is enough to show "a substantial likelihood that a reasonable shareholder would consider it important ...." 426 U.S., ante, at 449, 96 S.Ct., at 2132. The district court specifically so found, and it was not error for it further to find that the insider information might have been sufficient actually to reverse a shareholder's bearish feelings about the stock. It is not to be forgotten that the stockholders' most recent news was the gloomy report of December 12. At the time of the disputed stock purchase, the last news to the general public was that RIT was suing to recover over $500,000 owed it by City Center, the owner of the Kroger Building, for rent due, and for mortgage payments advanced by RIT on City Center's behalf; that RIT's quarterly earnings were down over 60%; and that it was "not currently earning a satisfactory rate of return on any of its foreclosure properties."

At the same time, defendant knew not only of RIT's acquisition of the Kroger Building, but also of at least a strong probability that Kenner would lease therein approximately 100,000 square feet of previously vacant space at an annual rental of roughly $500,000. The combined value to RIT of these two transactions as reflected by its December 24 press release, to which a trustee subscribed at trial, was approximately $2,000,000. Thus the court could find that the inside information known to defendant gave him reason to believe that in all likelihood the trust was going to be approximately $2,000,000 better off than a reasonable investor would expect. Since there were only 1,500,000 shares of RIT stock outstanding, the court could warrantably conclude that when the inside information became public, other things being equal, the stock would likely rise by more than a dollar per share.

This in fact happened. As already stated, on December 23, the day before the press

release was issued, RIT stock closed at 4⅝, and by December 31 it had risen to 5¾, a gain of 1⅛ per share. It was not clear error for the court to attribute the rise to the public disclosure of information pertaining to the Kroger Building and the Kenner lease. Nor can the court be faulted for holding that under all the circumstances, a reasonable RIT shareholder would consider this information, which pointed towards a 20% increase in the value of his stock, important in deciding whether or not to sell it.

Defendant argues that since, according to his witness, real estate trusts, generally, rose about 20% in early 1977, RIT's increase was attributable to general market conditions, and not the Kenner lease. This was a matter for the district court, not for us. We merely repeat that in light of the stockholders' report of December 12, the court could well have found that, without Kroger, RIT might not have followed the market. We are equally unimpressed with defendant's argument that because the successful negotiation of the Kenner lease was not "definite" at the time of the stock purchases, his inside information was not material as matter of law. In light of defendant's statements and the December 24 press release, the court could conclude that at the time of the stock purchases the lease was close enough to a sure thing as hardly to be considered a contingency at all. But even if not, investors regularly deal in probabilities and expectations, rather than certainties. The materiality of facts regarding a contingent future event is simply a function of the anticipated magnitude of the event if it occurs, discounted by the probability of its occurring. *See SEC v. Texas Gulf Sulphur Co.,* 2 Cir., 1968, 401 F.2d 833, 849, *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756. A "reasonable, if speculative, investor" would consider information indicating even the possible occurrence of an event of magnitude to be important. *Id.* at 849–50. Here, the future event was sufficiently large to remain material even discounting for whatever uncertainty may be thought to have existed. This is not to say that the Trust was obliged to disclose the information any earlier than it did. But, if

for valid reasons, a corporation does not deem material information ripe for public disclosure, so that disclosure by the insider would be a breach of fiduciary duty, the insider must refrain from dealing in the corporation's securities in the interim. *Id.* at 850 n. 12; *see Chiarella v. United States,* 1980, 445 U.S. 222, 226–29, 100 S.Ct. 1108, 1113–1115, 63 L.Ed.2d 348. See, generally, Brudney, Insiders, Outsiders, and Informational Advantages Under the Federal Securities Laws, 93 Harv.L.Rev. 322, 322–39 (1979). Defendant failed in that duty.

*Scienter*

In Rule 10b–5 private actions and enforcement actions alike, the plaintiff must prove scienter, defined by the Supreme Court as "a mental state embracing intent to deceive, manipulate or defraud." *Aaron v. SEC,* 1980, 446 U.S. 680, 686 n. 5, 100 S.Ct. 1945, 1950 n. 5, 64 L.Ed.2d 611; *Ernst & Ernst v. Hochfelder,* 1976, 425 U.S. 185, 193 & n. 12, 96 S.Ct. 1375, 1381 & n. 12, 47 L.Ed.2d 668. Proof of knowing conduct is sufficient to establish the necessary scienter. *E.g., Nelson v. Serwold,* 9 Cir., 1978, 576 F.2d 1332, 1337 (per curiam), *cert. denied,* 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431; *SEC v. Blatt,* 5 Cir., 1978, 583 F.2d 1325, 1334; *SEC v. Falstaff Brewing Corp.,* D.C.Cir., 1980, 629 F.2d 62, 77, *cert. denied,* 449 U.S. 1012, 101 S.Ct. 569, 66 L.Ed.2d 471; *see Aaron,* 446 U.S. ante, at 690, 100 S.Ct., at 1952; *Ernst & Ernst,* 425 U.S. ante, at 197, 96 S.Ct., at 1382 ("§ 10(b) was intended to proscribe knowing or intentional conduct"). Thus, in the present case, the requirement is satisfied if at the time defendant purchased stock he had actual knowledge of undisclosed material information; knew it was undisclosed, and knew it was material, *i.e.,* that a reasonable investor would consider the information important in making an investment decision. Defendant does not contest, as clearly erroneous, the court's finding that he had knowledge of the facts found to be material, and knew such facts to be undisclosed. He does claim, however, that the SEC failed to establish, and the court failed to find, the necessary third element, knowledge of materiality,

which he terms knowledge "that non-disclosure posed a risk of misleading sellers." We think the court made a sufficient finding to this effect when it specifically found that defendant's inside information was a motivating factor in his purchase of RIT stock. Obviously, if defendant himself considered the information important in deciding whether to purchase, he knew a reasonable investor would likewise consider it important in deciding whether to sell. It follows that the court's determination of scienter must stand unless it clearly erred in inferring that defendant purchased the stock at least in part because of the insider information. We find no error.

*Scienter—The Excluded Evidence*

On December 1 defendant met in Cincinnati with one Kaiser, the representative of Kenner, to discuss the lease. At the time of trial Kaiser was deceased. The court refused to allow defendant to testify to statements allegedly made by Kaiser regarding the obstacles facing the lease.

Counsel stated that the proposed evidence was not "hearsay because it's not offered to prove actually what was—" at which point the court interrupted, saying, "Well, no doubt in my mind it's being offered to prove the truth of the fact." This exchange was repeated twice more. The court was clearly wrong. Defendant had a right to testify what he was told for the purpose of establishing his state of mind, and, so viewed, it was not hearsay, but direct evidence. One of the SEC's burdens was to show defendant's belief that his inside information would be important to a reasonable investor. An ingredient of belief is what one is told, whether or not it is true in fact. *Winchell v. Moffat County State Bank*, 10 Cir., 1962, 307 F.2d 280, 282. The question, accordingly, is whether the exclusion was prejudicial.

Defendant's offer of proof (through counsel) was that Kaiser told him Kenner had "substantial difficulties with the City of Cincinnati in obtaining appropriate permits [because of] this particular proposed use of the building." The reference to the need for the permits was nothing novel. Both defendant and Freeman testified that defendant told the RIT officials about this requirement, and there is considerable else in the record about it, first and last. The problem is that, according to the offer of proof, Kaiser told defendant these difficulties were "substantial." The government asserts that "the court correctly excluded this testimony as cumulative." This was not the basis of the court's ruling. There is at least a question whether, had it been, it would have been correct.

The offer tended to contradict one of two possible constructions of defendant's letter of December 3 to Freeman, written two days after Kaiser's alleged remark. In it defendant had stated that their local contact "was optimistic that the Kenner Products Lease was 100% on target." This was the opposite of "substantial difficulties" about the City's permission. If the letter is read as indicating that the December 1 concerns had been relieved as a result of a conference with "Cincinnati officials late Tuesday afternoon, December 2nd," the exclusion of evidence that on December 1 Kaiser had reported substantial difficulties was clearly harmless. On the other hand, if the letter is read as contradicting the offer of proof, we may wonder whether the court would have been likely to credit the self-serving courtroom testimony over the contemporaneous letter. This is particularly so in light of defendant's deposition to the effect that as of December 12, he believed "you had to be a real incompetent not to be able to bring [Kenner] into the fold." Even if credited, the excluded evidence tended to show only what defendant might have believed on December 1, not what he learned later. The court made a supportable finding that defendant raised the limit on the purchase order, resulting in the purchase of 9,500 of the 9,600 shares, "upon getting good news on December 23." The court also warrantably found, despite defendant's repeated denials, that there was "a stream of communication with respect to circumstances relating to the Kenner lease in the period in early December of 1975." Under these circumstances it would strain creduli-

**52**

ty to think that the excluded December 1 evidence could have altered the court's finding—which we deem critical as to scienter—that the stock purchases commencing on December 16, the day after the board meeting, were "in part at least substantially prompted by information which Mr. MacDonald had with respect to both the Kenner lease and the acquisition of the title to the Kroger Building." Obviously, it would have been better had the court accepted the proffered evidence, but on the entire record we are satisfied that the exclusion did not affect defendant's substantial rights, Federal Rules of Evidence 103(a), and does not require reversal.

*Disgorgement*[3]

■ The district court ordered defendant to disgorge, for restitution to defrauded shareholders, the sum of $53,012 representing the profits he realized upon reselling the 9,600 shares of stock in early 1977 at roughly $10 per share. The court noted that since the essence of defendant's inside information was made public on December 24, 1975, "any changes in the market after a fairly reasonable period of time after the 24th of December were because of other developments." But it felt that it would be "inequitable to permit the defendant to retain the benefits of a bargain that was . . . clearly illegal, and that he should be required to disgorge the entire profits." Defendant complains.

The Commission correctly states the present question to be whether, where a corporate officer fraudulently purchased company shares "while in possession of material non-public information [he should be required, in an action brought by the Commission,] to disgorge the entire profits he realized from his subsequent sale of those securities about a year later, rather than limiting disgorgement to an amount representing the increased value of the shares at a reasonable time after public dissemination of the information." We would add that there was no evidence that this subsequent increase in value was attributable to any action of the defendant, nor was there any evidence as to why defendant continued to hold the shares. In other words, there were no special circumstances affecting what should be the normal result in this situation.

While the Commission states a single question in this case, it cannot be viewed in isolation; we must consider the principles, and the entire picture to which any decision must interrelate. We accordingly put four hypotheticals, predicated on the assumption that an insider fraudulently bought shares at $4.00, and that, throughout the entire month after the undisclosed information became public, the stock sold at $5.00.

(1) Insider sold forthwith for $5.00

(2) Stock declined thereafter and insider sold at $3.00.

(3) Stock rose a year later to $10.00, but then declined, and insider ultimately sold at $3.00.

(4) When the stock rose to $10.00, insider sold at $10.00

The Commission would, properly, seek $1.00 in case (1). It would also seek $1.00 in case (2), its given reason being that the $1.00 profit "could have been realized." It adds, and we agree, that if the insider were to be permitted credit for the loss, he would have an investment "cushion," a "heads-I-win-tails-I-win" proposition. In case (3) the Commission concedes that it is entitled to only $1.00. In case (4) the present case, it claims the $6.00 as being "ill-gotten gains."

Before discussing the subject generally, we note two immediate seeming inconsistencies in the Commission's reasoning. If

---

**3.** A panel composed of Chief Judge Coffin and Judges Aldrich and Breyer, Chief Judge Coffin dissenting, decided the disgorgement issue against the Commission. The Commission's petition for rehearing en banc on this issue was thereafter granted, with briefing and argument. Only the SEC responded. The present opinion contains, for convenience, the unanimous opinion of the panel up to the present point. The rest of that opinion, and the dissent thereto, are withdrawn, and the balance of the present, viz., an en banc opinion, and dissent, substituted.

Counsel for the SEC on rehearing en banc were Paul Gonson, Solicitor, with whom Edward F. Greene, General Counsel, Linda D. Fienberg, Associate General Counsel, Douglas J. Scheidt, Special Counsel, and Harlan W. Penn, Attorney, were on brief.

"could have been realized" is the test in case (2), equally a $6.00 profit "could have been realized" in case (3). Secondly, if the Commission does not claim the full realizable profit in case (3), as against case (4) is it not permitting the insider a "heads-I-win-tails-I-win cushion" which the Commission rejects in case (2)? We do not agree with the Commission's reasoning, or its conclusion in case (4). We also note, in passing, that inconsistencies do not bother the Commission. While it agrees with the court's result with relation to case (2) in *SEC v. Shapiro*, 2 Cir., 1974, 494 F.2d 1301, it rejects the court's reasoning based on avoidance of anomalies as "unnecessary to the decision."

To start at the beginning, in our earlier case of *Janigan v. Taylor*, 1 Cir., 1965, 344 F.2d 781, *cert. denied*, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120, approved by the Court in *Affiliated Ute Citizens of Utah v. United States*, 1972, 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741, the president of a closely held corporation, by fraudulently misrepresenting the company's prospects, bought out "virtually all" its outstanding stock for approximately $40,000. Two years later he sold it for $700,000. The increase was well beyond what could have been foreseen, on the true facts, by the fraudulent buyer. Nevertheless, we held that in the case of property,

"not bought from, but sold to the fraudulent party, future accretions not foreseeable at the time of the transfer even on the true facts, and hence speculative, are subject to another factor, viz., that they accrued to the fraudulent party. It may, as in the case at bar, be entirely speculative whether, had plaintiffs not sold, the series of fortunate occurrences would have happened in the same way, and to their same profit. However, there can be no speculation but that the defendant actually made the profit and, once it is found that he acquired the property by fraud, that the profit was the proximate consequence of the fraud, whether foreseeable or not. It is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them." 344 F.2d, ante, at 786.

At the same time we recognized that "[t]here are, of course, limits to this principle." *Id.*, at 787. While not discussed there, one of the limits that has emerged in cases following *Janigan* is that where the fraudulently obtained securities are publicly traded, and hence readily available, the defrauded sellers can recover only those accretions occurring up to a reasonable time after they discovered the truth. *See Baumel v. Rosen*, 4 Cir., 1969, 412 F.2d 571, 576, *cert. denied*, 396 U.S. 1037, 90 S.Ct. 681, 24 L.Ed.2d 681; *cf. Mitchell v. Texas Gulf Sulphur Co.*, 10th Cir., 1971, 446 F.2d 90, 105, *cert. denied*, 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558. As Judge Friendly has pointed out,

"The reason for this, in the case of marketable securities, is obvious. Once the seller has discovered the fraud, he can protect against further damage by replacing the securities and should not be allowed to profit from a further appreciation, while being protected against depreciation by his right to recover at least the difference in value at the time of his sale." *Gerstle v. Gamble-Skogmo, Inc.*, 2 Cir., 1973, 478 F.2d 1281, 1306 n. 27.

Conscious hedging aside, when a seller of publicly traded securities has learned of previously undisclosed material facts, and decides nevertheless not to replace the sold securities, he cannot later claim that his failure to obtain subsequent stock appreciation was a proximate consequence of his prior ignorance. "If he has failed to reinvest, . . . he must suffer the consequences of his own judgment." *Mitchell v. Texas Gulf Sulphur Co.*, ante, at 105. Consistent with this position, the ALI proposed Federal Securities Code (1978 Official Draft and 1981 Supp.), which is said to codify *Janigan*, Comment (3) to section 1708(a), initially limits an insider's liability for profits in a case like the present one to "his ill-got gains," Comment 2 to section 1708(b)(4) (1981 Supp.), defined as the excess over the insider's purchase price of the "value of the security as of the end of the reasonable period after . . . the time when all material

facts ... became generally available." Sections 1708(a)(2) and 1703(h)(1)A; *see* sections 1703(b) and 1708(b).

When a fraudulent buyer has reached the point of his full gain from the fraud, viz., the market price a reasonable time after the undisclosed information has become public, any consequence of a subsequent decision, be it to sell or to retain the stock, is res inter alios, not causally related to the fraud. The dissent would acknowledge this reasoning as "unanswerable if we view the case as one between two private individuals, one defrauded and the other defrauding," but says the result should be different if the Commission is the plaintiff.

The Commission's rule would depart from the principle of "equal footing," *SEC v. Shapiro,* 494 F.2d ante, at 1309, and measure assessments by purely fortuitous circumstances. If two fraudulent insiders bought at the same time and price, but, well after public disclosure, sold at different times and prices, their assessments would be measured by their selling dates, choices they made entirely independent of the fraud. To call the additional profits made by the insider who held until the price went higher "ill-gotten gains," or "unjust enrichment," is merely to give a dog a bad name and hang him. The dissent's measure, "damage done to investor confidence and the integrity of the nation's capital markets," if a measure at all, is the same for each of the fraudulent investors hypothesized in examples 1–4, ante. Granted that it may add to the deterrent effect of the Act every time the Commission conceives of a ground for assessing greater liability, to charge one class of insiders more than others who had committed precisely the same fraudulent act does not seem to us to meet any definition of "equitable."

No case supports the Commission. In two, where the Commission sought to assess the profits acquired by the insider's reinvestment of his wrongfully obtained profits, the court held it could not do so, because these further profits were not causally related. In *SEC v. Blatt,* 5 Cir., 1978, 583 F.2d 1325, the court said, at 1335,

"Disgorgement is remedial and not punitive. The court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing. Any further sum would constitute a penalty assessment. In *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082 (2d Cir.1972), the court held that the trial court erred in ordering restitution of income earned on ill-gotten profits. The court held that the defendant could be compelled only to disgorge profits and interest wrongfully obtained."

We see no legal or equitable difference, absent some special circumstances, none of which was found here, between an insider's decision to retain his original investment with the hope of profit and a decision to sell it and invest in something else. In both cases the subsequent profits are purely new matter. There should be a cut-off date, both ways, in cases where, unlike *Janigan,* the sellers have an opportunity to take remedial action.

This is essentially the approach taken in *SEC v. Shapiro,* ante, where the court required defendant to disgorge profits accrued from the rise in price caused by the disclosure, despite a price drop some time later, since had the price risen after the cut-off date, "he could [have kept] subsequent profits." *Id.* at 1309. Similarly, in the *Texas Gulf Sulphur* litigation, the insiders were required to disgorge only those profits accrued prior to the time the inside information was in general circulation among the investing public. *SEC v. Texas Gulf Sulphur Co.,* S.D.N.Y., 1970, 312 F.Supp. 77, *modified on other grounds,* 2nd Cir., 1971, 446 F.2d 1301, *cert. denied,* 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558.

The inside information in the case at bar is considerably less spectacular than that in *Texas Gulf,* and, accordingly, the reasonable period for the general dissemination, and then, digestion, of the December 24 press release could be expected to be longer than the one day period deemed sufficient there. Since, in the present case, there is no evidence of other material events during the

period in question, the market itself may be the best indicator of how long it took for the investing public to learn of, and react to, the disclosed facts. The natural effect of public disclosure would be to increase the demand for, and correspondingly, the price of, RIT stock, and once investors stopped reacting to the good news, the price could be expected temporarily to level off. Therefore, upon remand, in determining what was a reasonable time after the inside information had been generally disseminated, the court should consider the volume and price at which RIT shares were traded following disclosure, insofar as they suggested the date by which the news had been fully digested and acted upon by investors. And, although we have distinguished *Janigan* on the facts, we do not depart from the principle that doubts are to be resolved against the defrauding party.

The order requiring the disgorgement of $53,012 is reversed. On remand the district court should determine a figure based upon the price of RIT stock a reasonable time after public dissemination of the inside information. Under the circumstances, assessment of pre-judgment interest on the amount to be disgorged, commencing on the valuation date chosen by the court, would be appropriate. In all other respects the judgment of the district court is affirmed.

COFFIN, Chief Judge, with whom BOWNES, Circuit Judge, joins, dissenting in part.

I join the panel's opinion on the issues relating to liability. I disagree with the holding of the court en banc that a district court may not, absent special circumstances, require an insider who fraudulently trades on the basis of undisclosed material information to disgorge all of his ill-gotten gains in a suit by the SEC.

The court's opinion seems to me unanswerable if we view the case as one between two private individuals, one defraud-ed and the other defrauding. It does not, however, seem persuasive to me in this case in which the opposed interests are the investing community as a whole, represented by the SEC, and an individual who has seriously broken the rules of that community to his significant advantage. I concede that there is no case or other authority clearly sanctioning full disgorgement as "equitable". But to analyze this case in terms of a seller's ability to repurchase securities after the public disclosure of inside information seems to me to assume that the public instrumentality created to monitor the securities markets for the good of all stands in shoes no larger than those of a defrauded individual. Although what we might call *private* equity can give adequate protection to the individual, it seems to me that *public* equity in the contemporary world should permit a court, in the exercise of its discretion under 15 U.S.C. § 78u(d), to safeguard the integrity of the securities markets as a whole by imposing, in a proper case, the civil sanction of full disgorgement of the actual profits of an illegal bargain. I see no authority barring this result and every reason of public policy justifying it.

Unlike a private plaintiff, the SEC does not sue for injury to itself; nor does it sue solely for the losses of sellers immediately injured by the defendant's fraud. Rather, it sues for the whole injury inflicted by the fraud. That injury includes the damage done to investor confidence and the integrity of the nation's capital markets, and is necessarily greater than the profits at issue in a private suit. I agree that the SEC in a civil enforcement action may seek only "remedial" and not punitive relief. But even if disgorgement must be strictly "compensatory" to be "remedial" (and I believe it need not be), society simply is not made whole by the court's measure of disgorgement. Although the broader social damage of an inside trade is diffuse, even diffuse damage may be large in the aggregate,[1] and it is a settled principle of even private

---

1. Indeed, this larger social damage is a major, even overriding object of the prohibition of inside trading. *See Rochelle v. Marine Midland Trust Co. of New York*, 535 F.2d 523, 532 (9th Cir.1976); *United States v. Chiarella*, 588 F.2d 1358, 1365 (2d Cir.1978), *rev'd on other grounds*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980).

equity that where the nature of a wrong makes damage calculations difficult, as here, it is better to give the plaintiff a windfall than to permit the wrongdoer to profit from his wrong. *See Janigan v. Taylor,* 344 F.2d 781, 786 (1st Cir.), *cert. denied,* 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1968), *approved in Affiliated Ute Citizens v. United States,* 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972).[2] At the very least, the burden is on the wrongdoer to prove the appropriateness of a lower measure. These principles apply with added force here, for the plaintiff is not a private party pursuing a personal windfall, but a public agency enforcing broad public interests.

My disagreement with the court's measure of disgorgement is sharpened by my view of its inadequacy as a deterrent.[3] Since disgorgement only deprives the wrongdoer of his profit, even full disgorgement, without more, cannot deter all insider trading, for the risk of detection is less than 100 per cent and the insider can never lose more than he stands to gain. Full disgorgement will, however, deter insiders like appellant where, as here, the additional profits subject to disgorgement under a full disgorgement rule are substantial. Under the court's approach, an insider like appellant who anticipates $1 per share in profit from inside information and $5 per share in later appreciation has nothing to lose from inside trading, because he keeps $5 in profit even if he is caught. A rational insider would not engage in inside trading, however, if he faced full disgorgement, for he would not rationally risk $5 in otherwise lawful profits for the sake of an extra $1 in ill-gotten gain.[4]

I find the SEC enforcement cases cited by the court to be no barrier to the approach I urge. In *Texas Gulf,* disgorgement was not an issue; moreover, there is no negative pregnant to be derived from the sanction of partial disgorgement imposed there.[5] As for *Shapiro,* ignoring losses after disclosure of the inside information does not require that gains after disclosure also be ignored. The purpose of the *Shapiro* rule is to avoid giving the wrongdoer an incentive to wrongdoing—to avoid giving him a "heads-I-win-tails-you-lose" opportunity by allowing him to "keep subsequent profits but not suffer subsequent losses". 494 F.2d at 1309. Given this purpose, I see no reason not to put the SEC in the position of winning whether the wrongdoing is followed by losses or profits. Finally, *Manor Nursing* is not on point, for it involved

---

**2.** *Accord, Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 265–66, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946) ("ancient" and "most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created") (anti-trust case; noting principle's wide applicability in other areas as well); *Hamilton-Brown Shoe Co. v. Wolf Bros. & Co.,* 240 U.S. 251, 261–62, 36 S.Ct. 269, 272–273, 60 L.Ed. 629 (1916) ("established principle[ ] of equity" that a defendant may not defeat full recovery by "confusing his own gains with those which belong to plaintiff, or because of the inherent impossibility of making an approximate apportionment") (trademark infringement); D. Dobbs, *Handbook of the Law of Remedies* 276 (principle especially applicable where, as here, violation is willful). While these authorities deal with areas of the law other than securities, the public interest in investment and the integrity of the nation's capital markets is at least as strong.

**3.** Contrary to the court's assertion, deterrence is not penalty, but a legitimate and recognized

end of equity in cases of conscious wrongdoing. *See, e.g., Restatement of Restitution* § 202 comment c at 821.

**4.** Appellant purchased 100 shares of RIT at $4.25/share and 9,600 shares at $4.625. The price jumped to $5.50 after disclosure of the inside information, closed a few days later at $5.75, and averaged over $10 when appellant sold a year later. The actual deterrent impact of any disgorgement remedy, partial or full, of course will to a substantial extent depend on the insider's expectations at the time of his purchase, and his perception of the probability of detection and enforcement, rather than on what subsequently befalls him.

**5.** Moreover, the district court's disgorgement order was not strictly limited to the insider's own profits, for the court ordered the insider to disgorge profits made by his tippees as well, on the theory that such disgorgement was necessary as a deterrent, lest the prohibition on inside trading be evaded by wholesale reciprocal tipping.

neither insider trading nor the proper time for measuring damages in such a case. To the extent it is persuasive to all, it supports full disgorgement here, for it is premised on a measure of disgorgement adequate to provide "sufficient deterrence to further violations".[6] 458 F.2d at 1104.

Nor does the court's reliance on the ALI's proposed Federal Securities Code persuade me. First, the provisions cited by the court deal with private damage actions, not suits in equity by the SEC. Second, although the Code states that a defrauded seller's damages should generally be determined by the value of the securities at the end of a reasonable period following full disclosure, the Code also authorizes a district court to award 150 per cent of the ordinary figure to provide a deterrent against trading which fouls the public marketplace where, as here, an insider has fraudulently traded on the basis of inside information. ALI Federal Securities Code § 1708(b)(4) (1981 Supp.) & comment 2. Moreover, under section 1702(e), a seller victimized by a "non-fraud-type" violation may recover as damages the value of the security *on the date of the judgment,* less the amount he received for the security. In effect, the innocent party has a right to rescind the transaction.[7] Like the 150 per cent provision of section 1708, the aim of section 1702 is to deter violations. ALI Federal Securities Code § 1708 introductory comment 5(d). From the SEC's perspective, a transaction is just as illegal whether it is a fraud-type violation or a non-fraud-type violation. In addition, once the principle of deterrence is recognized, section 1708's suggested limitation of 150 per cent of profits to the time of disclosure is arbitrary: although such a cap may be appropriate in a private suit, where deterrence and enforcement incentives must be balanced against the inequity of giving a plaintiff an undue windfall, an artificial limit on disgorgement is wholly inappropriate in a public enforcement action by the SEC, where the policy against windfall awards is absent. Without attempting a formula for all cases, I would hold that on this record a district court should have power to order disgorgement of any amount up to the wrongdoer's full actual profits from the fraudulently acquired securities, its discretion in exercising that power to depend on the particular need for deterrence presented by the offender and the offense, and the equities of the case. Indeed, the Code explicitly recognizes a district court's power generally to adjust damages in this fashion. § 1723(e). Finally, full disgorgement leaves the wrongdoer in exactly the same financial position as rescission; if rescission is equitable, so is full disgorgement.

In the present case, it is not unreasonable to view *all* of appellant's profits as "ill gotten". Absent an opportunity to trade on inside information, there is no evidence in the record that appellant would ever have purchased the stock. Having made the illegal purchase, appellant may have decided to hold the stock to take advantage of capital gains treatment under the tax laws, to avoid disgorgement of short-swing profits under 15 U.S.C. § 78p(b), to diminish the risk of detection, or to avoid an appearance of disloyalty to his company—reasons unrelated to the sort of independent investment decision posited by the court. *Janigan* dictates that this uncertainty be resolved against the fraudulent party.

In short, I see more vitality than my brothers in *Janigan,* where the court held that once it is found that a defendant acquired property by fraud, "[i]t is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them." 344 F.2d at

---

**6.** *SEC v. Blatt* is likewise off point. In that case, a panel of the Fifth Circuit reversed an order directing the wrongdoers, who had been required to disgorge funds, to pay in addition the expenses of trustees in collecting and disbursing those funds. Not only was the court's focus, therefore, on a sanction in addition to disgorgement, but its rote recitation of authorities offers little in persuasive analysis and sheds little light on the problem presented here.

**7.** Present law is equally if not more emphatic, declaring "void" all contracts "made in violation of any provision" of the Securities Exchange Act. 15 U.S.C. § 78cc(b).

786. Although, as the court notes, several courts have refused to apply *Janigan* in private damage actions where the fraudulently purchased securities are publicly traded, the SEC's remedial powers are not so restricted. The possibility that a defrauded *seller* could hedge his losses by reinvesting after full disclosure does not transform the profits subsequently made by the *buyer* as a result of the illegal trade into legitimate gains. In an SEC enforcement action, a court can legitimately seek to "disgorge ill-gotten gains or to restore the status quo, or to accomplish both objectives", *SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90, 95, 102 (2d Cir. 1978) (Friendly, J.); *see also SEC v. Penn Central Co.,* 450 F.Supp. 908, 916 (E.D.Pa. 1978), or to deter future violations of the securities laws, *see, e.g., Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 390–91 (2d Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 232, 38 L.Ed.2d 148 (1973).

Perhaps the real difference between my approach and the court's is merely a matter of burden of proof. Perhaps, in a given case, full disgorgement would be inappropriate, inequitable even in a public sense. But in such a case it seems only fair for the burden to be on the wrongdoer. Here, there is no question but that serious, willful wrong was done, with no mitigating circumstances. I see no reason why the SEC should, as the court evidently contemplates, have the burden of proving a negative (i.e., lack of independent investment motive) where it has already proven a serious infringement of public trust. I respectfully dissent.