## SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

### v.

### James E. MacDONALD, Jr., Defendant.

### Civ. A. No. 78–0073S.

United States District Court, D. Rhode Island.

June 13, 1983.

Willis H. Riccio, Regional Administrator by D. Robert Cervera, Regional Trial Counsel, Boston, Mass., for plaintiff.

John V. Kenny, Wakefield, R.I., for defendant.

## MEMORANDUM DECISION

SELYA, District Judge.

In this proceeding brought by the Securities and Exchange Commission ("SEC")

---

against defendant James E. MacDonald, Jr., the district court (Boyle, Chief Judge), sitting without jury, found that defendant violated the antifraud provisions of the Securities Exchange Act of 1934, section 10(b), 15 U.S.C. § 78j(b), and SEC Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.-10b–5, by making purchases of 9,600 shares of Realty Income Trust ("RIT") stock without disclosing certain material inside information learned in his capacity as chairman of RIT's board of trustees. The district court ordered disgorgement. Defendant appealed, contending that the court erred in its findings of materiality and scienter; in excluding certain evidence; and in its measurement of the profits to be disgorged. The Court of Appeals for the First Circuit, in a split decision, affirmed except as to the amount (finding that the court below erred in constructing the methodology underlying the calculations for disgorgement). *Securities and Exchange Commission v. MacDonald,* 699 F.2d 47 (1st Cir.1983) (en banc). The case was remanded for a new trial on the issue of damages. Following remand, it was transferred to my calendar; and a bench trial was had on June 1, 1983. This memorandum comprises the Court's findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P.

RIT is a real estate investment trust whose stock is traded on the American Stock Exchange. The present litigation revolves around defendant's knowledge of RIT's acquisition of a twenty-five story office building in Cincinnati, Ohio, and its likely negotiation of a profitable long-term lease of vacant space therein. The underlying facts are lucidly limned in Judge Aldrich's opinion, 699 F.2d at 48–49, and it would be pleonastic to repeat them here. Suffice it to say that defendant, having become privy to favorable confidential information regarding the aforementioned office tower on December 15, 1975, placed an order with his broker, using his wife as an intermediary (see 699 F.2d at 48 & n. 2), for the purchase of up to 20,000 shares of RIT stock at a price of 4¼. One hundred shares were purchased at that price. On December 23, defendant went personally to the broker's office and raised the purchase limit to $5 per share. This resulted in the purchase of 9,500 shares that day at 4⅝. The following day, December 24, RIT issued a press release, publicly announcing for the first time the salutary news.[1] The price of RIT stock rose from 4⅝ to 5½ in two days of trading—a rise of 19%—and closed the year at 5¾. Defendant retained the stock until 1977 when it was sold at an average price upwards of $10 per share.

The mandate of the Circuit Court of Appeals requires that this Court, on remand, "should determine a figure based upon the price of RIT stock a reasonable time after public dissemination of the inside information." 699 F.2d at 55, *i.e.,* the amount to be disgorged, and assess pre-judgment interest on that amount, commencing on the designated valuation date. The First Circuit adopted the "equal footing" philosophy of *Securities and Exchange Commission v. Shapiro,* 494 F.2d 1301, 1309 (2d Cir.1974); and held that the focal point in measuring the dollar amount of disgorgement should be:

> [w]hen a fraudulent buyer has reached the point of his full gain from the fraud, viz., the market price a reasonable time after the undisclosed information has become public, ...

699 F.2d at 54.

Put another way, this Court is to compute the amount of the defendant's ill-gotten gains by determining how much (if any) "paper" profit accrued between the acquisition date and the conclusion of what might be termed the gestation period (the gestation period being the time necessary for the market fully to absorb and act in response to the original inside information once that data has become generally accessible to investors).

---

1. The press release apparently resulted in the publication of a news article on page 8 of the December 31, 1975 edition of *The Wall Street Journal.* It also was accorded some local press coverage.

In addition to these general principles, Judge Aldrich took especial pains to guide the district court's analysis, on remand, in manner following:

> The inside information in the case at bar is considerably less spectacular than that in *Texas Gulf,* and, accordingly, the reasonable period for the general dissemination, and then, digestion, of the December 24 press release could be expected to be longer than the one day period deemed sufficient there. Since, in the present case, there is no evidence of other material events during the period in question, the market itself may be the best indicator of how long it took for the investing public to learn of, and react to, the disclosed facts. The natural effect of public disclosure would be to increase the demand for, and correspondingly, the price of, RIT stock, and once investors stopped reacting to the good news, the price could be expected temporarily to level off. Therefore, upon remand, in determining what was a reasonable time after the inside information had been generally disseminated, the court should consider the volume and price at which RIT shares were traded following disclosure, insofar as they suggested the date by which the news had been fully digested and acted upon by investors.

699 F.2d at 54–55.[2]

While disgorgement is to be viewed as "remedial and not punitive", 699 F.2d at 54, *quoting Securities and Exchange Commission v. Blatt,* 583 F.2d 1325, 1335 (5th Cir. 1978), all doubts are to be resolved against the insider-defendant. 699 F.2d at 55.

The evidence in this case amply indicates, and the Court finds, that RIT stock was thinly-traded; that, at the time of the events in question, the stock was subject to downward pressure both from prior pessimistic financial reports and from year-end tax selling; and that the December 24th press release did not fully equate with the extent and import of the information improperly availed of by the defendant. In any event, that release received scant immediate attention and had little overnight impact. *See, e.g.,* Exhibit G–1 at 13, Q. 50–52. It was issued, of course, on the eve of the Christmas holiday (a time when even demon investors might well be expected to be in repose). It can be inferred that it did not even reach its designated recipients until some days later. The Court further finds that it was the Wall Street Journal article of December 31st (itself in all probability a direct result of the earlier press release) which gained attention for, and brought credibility to, the good news.

Subsequent to that publication, the evidence reflects a surge in the stock's pricing, which reached a peak on January 9, 1976 (when 1300 shares were traded).[3] At that point in time, the price per share was $6.50. Atypical trading activity continued through January 19, 1976.[4]

Price data of record demonstrates, too, that after the stock rose to $6.50 per share at the January 9th market close, it remained there until January 13th, then backed off slightly, and thereafter stabilized for a time at the $6.50 price (see, e.g., quotes for trades occurring on January 21st).

The Court finds that this was the time frame within which the defendant reached the full advantage of his fraud; and the moment when the market had truly digested the import of the December 24th press release. It was here that the investing public stopped reacting to the favorable news.

---

**2.** The reference to *"Texas Gulf"* was to *SEC v. Texas Gulf Sulphur Co.,* 312 F.Supp. 77 (S.D.N.Y.1970), *modified on other grounds,* 446 F.2d 1301 (2d Cir.1971), *cert. denied,* 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971).

**3.** RIT stock customarily traded no more than a few hundred shares daily.

**4.** The exception which proves this generalization is that no stock at all was traded on January 16th.

While the defendant argues with vigor that, based on Mr. Huckins' testimony, the sweep of the announcement would have dissipated in one, two or three days at most, the Court rejects that testimony and that view.[5] The Court likewise discounts as persiflage the suggestion that the generally upward trend of the market for real estate investment trusts accounted for the rise in the price of RIT shares. And, the Court notes, all reasonable doubt must in any event be resolved against the malefactor. 699 F.2d at 55.

The Court thus fixes the price of $6.50 per share as the appropriate yardstick in this case.[6] At that level, reaction to the good news had been fully absorbed.

The defendant bought the interdicted 9600 shares for $44,362.50. The market value of those shares at the valuation date was $62,400.00. The ill-gotten excess to be disgorged is, therefore, $18,037.50. To this must be added pre-judgment interest from January 12, 1976 to date at 12% per annum (counsel having stipulated at trial to the use of that rate for this purpose).

Counsel for the SEC shall prepare and present for entry a form of judgment consonant with the foregoing.

SO ORDERED.

---

[5] The Court is aware of the one day period deemed adequate for dissemination in the *Texas Gulf Sulphur* litigation, but is mindful of the First Circuit's admonition that "the inside information in the case at bar is considerably less spectacular ... and, accordingly, the reasonable period ... could be expected to be longer [here]". 699 F.2d at 54. The Court notes that in *SEC v. Shapiro, supra,* cited with approval by the First Circuit, the initial public proclamation of the inside information occurred on February 5, 1971, and the Second Circuit approved a fixing of February 18th as the disgorgement valuation date. *Id.* 494 F.2d at 1307 & n. 4.

[6] There were, except as mentioned above, no other material events during the period in question.