JORDAN, Circuit Judge,
dissenting in part.
A court may exercise its equitable power to order disgorgement “only over ... property causally related to the wrongdoing.” CFTC v. Am. Metals Exch. Corp., 991 F.2d 71, 78-79 (3d Cir.1993) (internal quotation marks omitted). Because there is no legitimate dispute that Best Buy’s tender offer was independent of the Appellants’ securities law violations,[1] the profits on their sale of Musicland stock that are solely attributable to Best Buy’s tender offer should not be subject to disgorgement. That is not to say that the balance of their profits is untainted. The remaining profits may well be subject to disgorgement to one degree or another, but whether they are or not is a determination that the District Court should make in the first instance, while properly addressing the question of causation. For that reason, I would vacate the District Court’s disgorgement order and remand the case, and I therefore respectfully dissent from that part of the Majority’s opinion that affirms the District Court’s ruling on disgorgement.
“As an exercise of its equity powers, the court may order wrongdoers to disgorge their fraudulently obtained profits.” SEC v. Fischbach Corp., 133 F.3d 170, 175 (2d Cir.1997). But “an order to disgorge is not a punitive measure; it is intended primarily to prevent unjust enrichment.” Zacharias v. SEC, 569 F.3d 458, 471 (D.C.Cir.2009) (per curiam) (internal quotation marks omitted); see also SEC v. Bilzerian, 29 F.3d 689, 697 (D.C.Cir.1994) (noting that disgorgement is aimed at “de-priv[ing] the wrongdoer of his ill-gotten gain” (internal quotation marks omitted)). Given that the primary goal of disgorgement is to prevent unjust enrichment, the United States Court of Appeals for the District of Columbia Circuit observed in SEC v. First City Financial Corp. that there must be a causal relationship between the property to be disgorged and the proven wrongdoing. 890 F.2d 1215, 1231 (D.C.Cir.1989). More specifically, there must “be a relationship between the amount of disgorgement and the amount of ill-gotten gain.” Am. Metals Exch., 991 F.2d at 79; see also Bilzerian, 29 F.3d at 696. That causal link is what makes disgorgement a remedial measure rather than a punitive one. As the Majority rightly acknowledges, “[t]he remedy may well be a key to the SEC’s efforts to deter others from violating the securities laws, but disgorgement may not be used punitively.” (Maj. Op. at 103 (quoting First City, 890 F.2d at 1231).)[2]
*111 The Appellants rely on Wellman v. Dickinson, 682 F.2d 355 (2d Cir.1982), to argue that “the SEC bears the burden of demonstrating that the profits sought to be disgorged ‘proceed directly and proximately from the violation claimed.’ ”[3] (Appellants’ Opening Br. at 58 (quoting Wellman, 682 F.2d at 368).) The Majority answers by distinguishing Wellman, and I accept my colleagues’ conclusion that a direct and proximate causation standard is not applicable in this case, that a lower “but-for” standard of causation will suffice. The Majority also adopts the burden-shifting framework from First City, in which the SEC has the initial burden of showing “a reasonable approximation of ‘actual profits on the tainted transactions,’ ... [which] creates a presumption of illegal profits.” (Maj. Op. at 105 (quoting First City, 890 F.2d at 1231).) Implicit in the statement that the transactions are “tainted,” though, is a recognition that the SEC must have satisfied its initial burden of showing causation by producing evidence that a violation occurred and that some plausible relationship exists between that violation and the profits gained.
With that showing, it may be “proper to assume that all profits gained while defendants were in violation of the law constitute!] ill-gotten gains,” SEC v. Bilzerian, 814 F.Supp. 116, 121 (D.D.C.1993), affd, 29 F.3d 689. Hence, as the Majority holds, the SEC’s initial burden can be satisfied by demonstrating that, but for a defendant’s illegal actions, the profits would have been different. That is a sensible approach, as the risk of uncertainty about how differently events would have unfolded “should fall on the wrongdoer whose illegal conduct created that uncertainty.” First City, 890 F.2d at 1232; see also SEC v. MacDonald, 699 F.2d 47, 55 (1st Cir. 1983) (en banc) (adhering to the principle that “doubts are to be resolved against the defrauding party”).
Here, the SEC made a showing that the shares of Musicland stock that the Appellants acquired after July 30, 1998, were tainted because, but for the Appellants’ failure to properly disclose information, the Appellants would have obtained their shares of Musicland stock under different and presumably more expensive market conditions. Had, for example, Teo disclosed his true beneficial ownership and his plans to change Musicland’s Board or take Musicland private, Musicland’s stock price may well have increased. To the extent the Majority relies on such reasoning, I agree with them that the SEC met its initial burden to establish that a plausible relationship exists between the Appellants’ securities violations and the profits gained.[4]
But disgorgement is not an all-or-nothing matter. Again, only the extent of profits with a causal connection to the wrongdoing — i.e., the ill-gotten gains — are *112 subject to disgorgement. See MacDonald, 699 F.2d at 55 (holding that not all subsequent profits are subject to disgorgement, only those “based upon the price of [the] stock a reasonable time after public dissemination of the inside information”). Thus, once the SEC has made the initial showing required to presumptively establish causation, “the burden shifts ... to the defendant to ‘demonstrate that the disgorgement figure [is] not a reasonable approximation.’” (Maj. Op. at 105 (alteration in original) (quoting First City, 890 F.2d at 1232).) That burden warrants some clarification. When the SEC comes forward with a reasonable approximation of tainted profits, the burden of production then shifts to the defendant to produce evidence showing that all or some part of the sum in question should not be subject to disgorgement. As the court in First City explained, a defendant must show that “the disgorgement figure [i]s not a reasonable approximation ..., for instance, by pointing to intervening events from the time of the violation.” See First City, 890 F.2d at 1232. Proof of an intervening cause is therefore one way that a defendant can challenge a disgorgement calculation, because an intervening cause indicates that not all of the profits are, in fact, tainted by wrongdoing.
Here is where it seems I part from my colleagues’ view of the ease. It is true that the SEC met its initial burden of showing that some plausible relationship exists between the Appellants’ violations and the profits they gained. However, it is also true that the Appellants then pointed to the Best Buy tender offer as an independent cause. Neither the District Court nor the Majority appropriately accounts for the Best Buy tender offer. While the Majority pays lip service to the limiting principle that, to avoid being a punitive measure, a disgorgement order must be limited to ill-gotten gains, my colleagues do not actually apply that principle to the admitted premium associated with the Best Buy transaction.[5]
The Majority states that “[t]he Appellants do not appeal the calculation of the disgorgement, but rather assert the District Court wrongly granted the SEC’s motion for this remedy.” (Maj. Op. at 101.) Admittedly, at oral argument the Appellants called the causation analysis a threshold issue, separate from the calculation of disgorgement. But the Appellants’ submission of an independent cause is perfectly sensible as a challenge to the calculation of a disgorgement figure: implicit in their argument is the notion that the District Court’s disgorgement figure is incorrect and that they should not be penalized with respect to the Best Buy transaction. Cfi Am. Metals Exch., 991 F.2d at 79 {“In crafting any disgorgement remedy on remand, the district court should keep in mind the limitation placed on its equitable powers by th[e] requirement that there be a relationship between the amount of disgorgement and the amount of ill-gotten gain.” (emphasis added)); First City, 890 F.2d at 1230 (addressing intervening causes within “the question of how the court measures th[e] illegal profits”); Bilzerian, 814 F.Supp. at 121 (discussing intervening causes within “[t]he sole remaining issue [of] what portion of the[ ] profits is subject to disgorgement”). Indeed, my colleagues consider the Appellants’ eviden- *113 tiary burden in the context of showing that a “disgorgement figure ” is an unreasonable “approximation of profits” (Maj. Op. at 106, 108 (emphasis added)). On the briefing and record before us, the Appellants’ independent-cause argument fairly calls into question the disgorgement figure.[6]
The Best Buy tender offer is clearly an independent and intervening event. It bears no relationship to the Appellants’ securities violations. According to Music-land’s CEO, Teo “had nothing to do with finding Best Buy” (J.A. at 318) and was neither involved in the initial discussions nor informed about them by Musicland. In addition, Best Buy was fully aware of the combined ownership of Teo and the Trust, notwithstanding Teo’s public disclaimer of beneficial ownership of the Trust’s shares, and Best Buy required both Appellants to sign “Shareholder Support Agreements” to tender or otherwise sell all of their Musicland shares in connection with Best Buy’s planned tender offer. (J.A. at 751-57, 758-64, 1814.) The Appellants have consistently — and, in light of those facts, credibly — maintained that the Best Buy tender offer constitutes an entirely independent cause of profit on their stock.
Nevertheless, the District Court’s comment as to a connection between the Appellants’ violations and the Best Buy transaction was that “the Best Buy tender offer constituted a market correction that Teo anticipated when he bought what he considered to be undervalued shares,” as if anticipating that shares are undervalued were, in itself, somehow inappropriate. (J.A. at 20.) Making a profit on undervalued shares, however, is a strategy pursued by law-abiding investors all the time. There is nothing suspect about it. No logical reason has been proposed by anyone for presuming a connection between the Appellants’ profit associated with the Best Buy tender offer and any wrongdoing. The Majority, meanwhile, faults the Appellants for “[m]erely positing the Best Buy tender offer as an intervening cause.” (Maj. Op. at 108.) But the Appellants have not simply uttered the words “Best Buy.” They have cogently explained, with citations to the record, why the Best Buy tender offer was independent of all action (or inaction) on their part. (See Appellants’ Opening Br. at 65-66 (citing J.A. at 318, 705, 708-10).) In light of the undisputed facts, it is difficult to fathom how the Best Buy tender offer could be anything other than an independent cause.
The Majority states, without any supporting authority, that the Appellants’ “burden is not simply one of carrying the ball back across the fifty-yard line” but one of “adducing] — at a minimum — specific evidence explaining the interplay (or lack thereof) among the violation(s) at issue.” (Maj. Op. at 108.) I fundamentally disagree with that assertion. It is axiomatic that “the SEC bears the ultimate burden of persuasion.” First City, 890 F.2d at 1232. Therefore, once a defendant has pushed back with evidence of what is more likely than not an intervening cause, it is the SEC’s responsibility to carry the ball.
Again, a key point that is lost in the Majority’s football analogy is that disgorgement is not an all-or-nothing proposition. While, “[i]n the insider trading con *114 text, courts typically require the violator to return all profits made on the illegal trades,” id. at 1231, courts may limit disgorgement to an amount based on the price of the stock “a reasonable time after public dissemination of the inside information,” MacDonald, 699 F.2d at 55. For example, in MacDonald, the appellant had violated the antifraud provisions of § 10(b) of the Exchange Act by purchasing a company’s stock without disclosing the fact that the company would be acquiring an office building and likely negotiating a profitable long-term lease of space in that building. Id. at 48. When the company publicly announced that acquisition and potential lease the following day, the price of the stock jumped. Id. at 49. The appellant held on to the stock for more than a year, after which he sold at an even higher price. Id.
On appeal, the First Circuit, sitting en banc, considered the question of
whether, where [a defendant] fraudulently purchased company shares while in possession of material non-public information[,] [he should be required, in an action brought by the Commission,] to disgorge the entire profits he realized from his subsequent sale of those securities about a year later, rather than limiting disgorgement to an amount representing the increased value of the shares at a reasonable time after public dissemination of the information.
Id. at 52 (third alteration in original) (internal quotation marks omitted). The court answered in the negative, holding that profits made as a result of stock price increases after a reasonable time following the disclosure of inside information “are purely new matter” and not subject to disgorgement. Id. at 54. “To call the additional profits made by the insider who held until the price went higher ‘ill-gotten gains,’ or ‘unjust enrichment,’ is merely to give a dog a bad name and hang him.” Id.
To illustrate, the MacDonald court presented two hypothetical, both under the assumption that an insider fraudulently bought stock at $4 per share and that, for the entire month after the inside information became public, the stock sold at $5 per share. Id. at 52. In the first scenario, the insider sold the stock for $5 during that month. Id. For this scenario, the court reasoned that the SEC could properly seek $1 per share as ill-gotten gains. Id. The court then posited a second scenario in which the stock price later increased to $10 per share, at which point the insider sold his shares. Id. The SEC argued that the disgorgement in this second scenario— analogous to the exact facts before the MacDonald court — should be $6 per share. Id. The court, however, disagreed with the SEC’s assertion, noting that to award the entire actual profits as disgorgement would be to measure disgorgement “by purely fortuitous circumstances.” Id. at 54. The court held that the “further profits were not causally related” to the wrongdoing and that, “absent some special circumstances,” an insider’s subsequent decision to retain his original investment should not create any “legal or equitable difference.” Id. Therefore, the court concluded that “[t]here should be a cut-off date” for the profits to be disgorged and remanded for the district court to “determine a [disgorgement] figure based upon the price of [the] stock a reasonable time after public dissemination of the inside information.” Id. at 54-55; see also SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1104 (2d Cir.1972) (refusing to extend disgorgement to income subsequently earned on the initial illegal proceeds).
By limiting disgorgement to a reasonable time after public dissemination of inside information, the court in MacDonald soundly cordoned off profits that were too attenuated from the non-disclosure and insulated them from disgorgement. Mac *115 Donald, therefore stands for the proposition that, when there is a clear break in causation, only profits attained prior to that break are subject to disgorgement. Any additional profits, coming as they do from fortuitous circumstances, are not sufficiently related to the wrongdoing to be subject to disgorgement.
Unlike in MacDonald, the information that the Appellants withheld in this case was not later released to the market. Nevertheless, the premium that Best Buy offered was unrelated to the wrongdoing at issue and created an analogous causal break.[7] As we have previously emphasized, “[i]n crafting any disgorgement remedy ..., the district court should keep in mind the limitation placed on its equitable powers by th[e] requirement that there be a relationship between the amount of disgorgement and the amount of ill-gotten gain.” Am. Metals Exch., 991 F.2d at 79. By awarding disgorgement on the profits related to the Best Buy transaction, the District Court abused its discretion.[8] And by failing to limit disgorgement to ill-gotten gains, my colleagues effectively endorse a penalty assessment, in the name of enforcing federal securities law. Accordingly, I dissent.[9]

. Specifically, the jury found that Teo had violated the antifraud provisions of the Securities Exchange Act § 10(b) and Rule 1 Ob-6, and that both Teo and the Trust had violated the reporting provisions of the Securities Exchange Act § 13(d) and Rules 13d-l and 13d-2.

. It is well-established that "[r]etribution and deterrence are not legitimate nonpunitive governmental objectives.” United States v. Halper, 490 U.S. 435, 449, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989) (alteration in original) (quoting Bell v. Wolfish, 441 U.S. 520, 539, n. 20, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)) (internal quotation marks omitted). Despite that, the notion that deterrence is an acceptable goal of disgorgement has entered our jurisprudence via First City. See, e.g., SEC v. Hughes Capital Corp., 124 F.3d 449, 455 (3d Cir.1997) ("Disgorgement is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating securities laws.” (quoting SEC *111 v. First City Fin. Corp., 890 F.2d 1215, 1230 (D.C.Cir.1989)) (internal quotation marks omitted)).

. The Appellants do not dispute that disgorgement is an appropriate remedy when, as in this case, a defendant has violated §§ 10(b) and 13(d) of the Securities Exchange Act, nor could they credibly do so. See, e.g., First City, 890 F.2d at 1230 (“[D]isgorgement is rather routinely ordered for insider trading violations ... [and] [w]e ... see no relevant distinction between disgorgement of inside trading profits and disgorgement of post-section 13(d) violation profits.”); SEC v. Bilzerian, 814 F.Supp. 116, 121 (D.D.C.1993), aff'd, 29 F.3d 689 (“Defendant must disgorge the profits he obtained as a result of ... violations [of §§ 10(b) and 13(d)].”).

. I use the term “profits gained” as shorthand for the $17,422,054.13 in net profits, excluding margin interest paid, that the District Court determined were not already subject to the penalties imposed in connection with Teo's insider trading conviction.

. Used in the context of a tender offer, a "premium” is generally the "amount over market value paid.” John Downes & Jordan Elliot Goodman, Dictionary of Finance and Investment Terms 531 (7th ed.2006). In other words, it is the amount that Best Buy paid for Musicland's stock in excess of the stock's trading value at the time of the tender offer. The Majority cites "a $5 per share premium over the market price” (Maj. Op. at 108 n. 32), and the SEC seems to place the premium at $4.55 per share, or "a 60% takeover premium” (Appellee’s Br. at 62).

. My colleagues view the Appellants' argument as an effort to rebut the SEC’s showing of but-for causation in the burden-shifting framework that they have adopted. I agree that it aims to rebut causation. The Appellants expressly argue that they “would not have earned [their] profits had Best Buy not made its tender offer” and, thus, point to a break in causation. (Appellants' Opening Br. at 66.) That does not mean, however, that the argument is irrelevant when considering the extent of disgorgement.

. What sort of fortuitous event might constitute an intervening cause is not a question that lends itself to a broadly applicable response. Such a determination is fact-specific. Looking at the facts of this case, I am confident that the Best Buy transaction is an intervening cause. It had an obvious and discernible market effect that can, and has, been estimated by both the Majority and the SEC. Perhaps that is why the SEC confines itself to arguing that the Appellants should not avoid disgorgement entirely, rather than contending that the Appellants’ violations and the Best Buy tender offer are causally linked.

. A challenge to the calculation of a disgorgement award based on findings of fact is subject to clear error review, SEC v. Whittemore, 659 F.3d 1, 9 (D.C.Cir.2011), but we are addressing the Appellants' challenge that the District Court did not properly limit the disgorgement award such that the Court overreached its equitable powers. The Majority is thus correct that an “abuse of discretion” standard applies. Id. With respect to calculating disgorgement, it bears repeating that, "despite sophisticated econometric modeling, predicting stock market responses to alternative variables is[] ... at best speculative. Rules for calculating disgorgement must recognize that separating legal from illegal profits exactly may at times be a near-impossible task.” First City, 890 F.2d at 1231. For that reason, courts "have rejected calls to restrict disgorgement to the precise impact of the illegal trading on the market price," and the amount of disgorgement "need only be a reasonable approximation of profits causally connected to the violation.” Id. at 1231-32.

.Because the SEC sought, and the District Court imposed, a civil penalty equal to the amount of disgorgement, remanding the disgorgement award may have an effect on the civil penalty. The prejudgment interest on both amounts would also presumably be affected by a change in the disgorgement figure.