# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3388

_____

United States of America,

      Plaintiff-Appellee,

v.

Michael Alan Mooney,

      Defendant-Appellant.

Appeal from the United States
District Court for the
District of Minnesota.

_____

Submitted: November 20, 2003
Filed: July 23, 2004 (Corrected 7/27/04)

_____

Before MURPHY, LAY, and BRIGHT, Circuit Judges.

_____

PER CURIAM.

      Michael Alan Mooney was convicted by a jury of eight counts of mail fraud, four counts of securities fraud, and five counts of money laundering. The district court[1] sentenced him to 42 months, and Mooney appeals. He seeks a judgment of acquittal because of insufficient evidence, a new trial because of evidentiary error, or resentencing. We affirm Mooney's conviction but remand for further proceedings in respect to his sentence.

---

[1]The Honorable James M. Rosenbaum, Chief Judge, United States District Court for the District of Minnesota.

Mooney was formerly vice president of underwriting for United Healthcare Corporation (United). United is one of the largest health care management service companies in the country, and its stock trades on the New York Stock Exchange. Mooney opened a margin account in 1990 at the brokerage house Recom which he used solely to invest in United stock. Recom extended him a line of credit equal to half the value of the securities he maintained in the account. If the value of his securities were to fall below half the account's total value, Recom would make a margin call. Mooney would then have to make a deposit to restore equity in the account or Recom could sell assets of his to restore the 50% margin.

As part of United's strategy to acquire health insurance companies, it approached privately owned MetraHealth (Metra) in early 1995 and entered into negotiations with it in February. At that time Metra provided health insurance to more individuals than United, and it also had a substantial indemnity business. If United were to succeed in acquiring Metra, it would become the largest health care services company in the United States. It would have more than 40 million people enrolled in a variety of health care programs, with projected annual revenue of more than $8 billion. Mooney received stock options from time to time as part of his compensation at United, and on April 13 he exercised his right to purchase 20,000 shares of United stock for $36,000. The market value on that day for that amount of stock was $917,500.

During the 1995 negotiations, United and Metra conducted due diligence inquiries which involved confidential meetings at the headquarters of each company. Mooney had attended many such meetings on behalf of United in the past, and he and other senior representatives of United went to Metra's Virginia headquarters on May 11, 1995 for due diligence meetings. They spent four days looking through Metra's financial records, membership projections, cost data, and confidential Book of Business. United's corporate counsel reminded the participants in the meetings not to trade in stock during the due diligence period and to protect the secrecy of the

proceedings by referring to the proposed merger transaction as "Project Fjord" and to Metra as "Musky."

United has a written policy on insider trading which prohibits United employees from trading in its stock in two situations: (1) during the blackout period at the end of each quarter before the United earnings report is released, and (2) when an employee possesses material nonpublic information. The insider trading policy defines material nonpublic information as information that a reasonable investor would use in deciding whether to invest. It also states that information about proposed mergers and acquisitions by United is material. United's policy was frequently published in employee newsletters and mentioned in oral reminders at due diligence meetings.

After Mooney returned from the meetings at Metra's Virginia headquarters, he contacted his stockbroker on May 17, 1995 to sell the 20,000 shares of United common stock he had purchased in April. The sale cleared on May 24, and Mooney used part of the $775,500 proceeds to purchase call options in United stock. The call options were purchased between May 24 and June 14 for a total price of $258,283.03. They gave him the right to buy a total of 40,000 shares of United stock at $35 a share in the following months of September, December, and January. Both the sale of his United shares and his purchases of the United call options occurred before the end of the due diligence period in the Metra transaction.

Mooney subsequently sold his call options at a profit.[2] On July 14, 1995 he

---

[2]The purchase and sale prices of Mooney's options to buy United stock in the three future months are shown below:

| Options for | Bought | Sold | |
|---|---|---|---|
| September | $63,004.75 (June 6) | $94,536.52 (July 14) | |
| December | $81,800.83 (June 14) | $139,298.57 (October 4) | |
| January | $113,477.45 (May 24, 26) | $298,647.40 (October 5) | |
| | $258,283.03 | $532,482.49 | (+$274,199.46) |

sold the September options, and early in October he sold the December and January options. His total return on these sales was $532,482.49, and between August 3 and November 20, 1995 he deposited $428,000 into an account he had at Firstar Bank. These deposits were made by five checks drawn on his account at Recom Securities.[3]

The first media mention of the acquisition appeared on June 21, 1995 in the New York Times, which reported that United was in advanced discussions with Metra. United issued a press release on the same day, confirming the ongoing discussions. The daily volume of trade in United shares increased markedly, and the stock price rose 5%. On June 22 the Wall Street Journal reported speculation about United's approaching acquisition of Metra, and United common stock rose another 6%. Then on June 26 United announced its agreement to acquire Metra for $1.65 billion in cash and stock. On June 20, the day before the first national media story, United stock had traded at $40.125. By July 15 the price was $44.50 a share, and by October 5 it was over $49.00.

Shortly after the public announcement of United's acquisition of Metra, stock market surveillance officials notified the Securities and Exchange Commission (SEC) about bullish positions taken in United call options prior to the announcement of the acquisition. The SEC asked United to investigate whether Mooney had engaged in prohibited securities trading. Although Mooney denied it to United's corporate counsel, the SEC filed a civil action against him on August 2, 1999, alleging that the options were purchased while he had material nonpublic information regarding United's plan to acquire MetraHealth. The SEC sought an injunction, disgorgement of his gains, and a civil penalty. Shortly thereafter on August 9, United suspended Mooney for violating its insider trading policy. He later resigned. The SEC's civil action was stayed after he was indicted in this case.

---

[3]Mooney deposited $138,000 on August 3; $70,000 on August 9; $20,000 on October 23; $100,000 on November 3; and $100,000 on November 20.

The second superceding indictment alleged that Mooney knowingly devised and engaged in a scheme to defraud United and its shareholders through his May sale of United common stock and his subsequent purchase and sale of United call options, all while in possession of material nonpublic information concerning United's negotiations to acquire Metra. The indictment charged Mooney with eight counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 1346; four counts of securities fraud in violation of 15 U.S.C. §§ 78j(b), 78ff(a), and 17 C.F.R. § 240.10b-5; and five counts of money laundering in violation of 18 U.S.C. § 1957. The mail fraud counts referenced eight separate mailings of confirmation slips, for his May 17 sale of United common stock and for his subsequent call option transactions. The securities fraud counts covered his four separate purchases of call options. The money laundering counts were based on his deposits of five checks from Recom into his Firstar Bank account during August, October, and November 1995; the indictment alleged that these funds were derived from his securities and mail fraud.

Mooney was found guilty by a jury on all counts and required to forfeit $70,000. The district court denied his motions for judgment of acquittal or new trial and sentenced him to 42 months in prison and a $150,000 fine. Mooney appeals from the judgment, alleging insufficient evidence, abuse of discretion in an evidentiary ruling, and sentencing error.

In reviewing the sufficiency of the evidence in a case such as this, the evidence is considered in the light most favorable to the government, evidentiary conflicts are resolved in its favor, and all reasonable inferences are drawn from the evidence in support of the jury's verdict. See United States v. Ramirez, 350 F.3d 780, 783 (8th Cir. 2003). We will reverse only if no reasonable jury could have found the accused guilty beyond a reasonable doubt. Id.

Mooney argues that the government did not prove a scheme to defraud beyond a reasonable doubt. The government alleged that Mooney acquired material,

nonpublic information relating to United's acquisition of MetraHealth and that he breached the duty of trust he owed to United and its shareholders by purchasing the call options as part of a fraudulent scheme. Mooney's securities fraud charges alleged the use of manipulative and deceptive devices in connection with the purchase or sale of securities, see 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5, and false and misleading statements willfully made. See 15 U.S.C. § 78ff(a). Fraudulent intent need not be proven directly, but can be inferred from the facts and circumstances surrounding the defendant's actions. See United States v. Flynn, 196 F.3d 927, 929 (8th Cir. 1999).

Mooney contends that there was insufficient evidence to prove that he used material nonpublic information in violation of the securities laws. Mooney argues that his case differs from the typical insider trading case. He claims that an inside trader ordinarily knows to a greater degree of certainty how the stock price will be affected by the release of nonpublic information. See, e.g., United States v. O'Hagan, 521 U.S. 642 (1997) (defendant knew that price of stock would increase after hostile tender offer announced). He argues that it was not certain that the United stock price would increase because of the merger with Metra. The legal test is not whether the price would certainly rise, however, but whether the inside information used was material. See Basic, Inc. v. Levinson, 485 U.S. 224, 236 (1988). A fact is material in the securities fraud context if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. Id. at 231-32.

There was more than enough evidence here for a reasonable jury to find that Mooney's inside information was material. He exercised employee stock options to purchase United stock on April 13 after negotiations with Metra had begun. As soon as he returned home from the May due diligence meetings, he began to purchase call options for United stock. The jury could infer that Mooney sought to capitalize on his nonpublic information and anticipated he could profit by purchasing call options that could later be sold at a higher price. Mooney also had access to information that

the acquisition of Metra was likely to present new growth opportunities for United. Because of his participation in high level confidential meetings, Mooney knew that the due diligence review had not derailed negotiations and that United would only proceed with acquisitions that were expected to increase earnings. He also knew that United would grow considerably in size, programs, and projected revenue. All of this information would have been of interest to a reasonable investor, and the jury could have found a substantial likelihood that it would have been considered important in making investment decisions.

Mooney also contends that his transactions were not part of a fraudulent scheme, but rather began as a result of a margin call forcing him to sell some of his United common stock. His broker testified, however, that there was no record Mooney ever received a margin call, and other evidence showed that his account had not gone below the margin requirements before he sold his United shares in May. The broker also testified that Mooney's sale of United stock had had no significant effect on the margin status of his account. The trier of fact was entitled to find from this evidence that Mooney's May sale of United stock had nothing to do with a margin call.

Mooney also argues that any rational investor who observed the seasonal trends in the price of United stock would have made similar investment decisions. Whether or not that might be true, there was sufficient evidence for a reasonable jury to find Mooney's sale of common stock was part of a fraudulent scheme to use the sale proceeds to purchase the United call options, that these transactions were based on his use of material nonpublic information, and that there was sufficient evidence on all elements of the securities fraud counts.

Mooney argues that the government did not prove beyond a reasonable doubt that the mails were used to carry out the fraudulent scheme. A mail fraud conviction under 18 U.S.C. § 1341 requires proof that the defendant voluntarily and intentionally

devised or participated in a scheme to defraud, that he entered into the scheme with the intent to defraud, that he knew that it was reasonably foreseeable that the mails would be used, and that he used the mails in furtherance of the scheme. See United States v. Bearden, 265 F.3d 732, 736 (8th Cir. 2001).

Mooney contends that the only evidence of use of the mails was the mailing of confirmation slips to him by Recom after his May 17 sale of United stock and his subsequent purchases and sales of call options. Although he asserts that these mailings occurred after the alleged fraud, they fell within the time period of the fraudulent scheme alleged in the indictment, from "on or about February 1995 . . . continuing until October 6, 1995." The confirmation slips recorded transactions on May 24, 25, 30; June 7, 15; July 17; and October 5, 6, 1995. He argues further that he did not conceive these mailings to be part of the scheme's execution, citing Schmuck v. United States, 489 U.S. 705, 710 (1989). Mooney overlooks Schmuck's holding that the mailings need only be "incident to an essential part of the scheme" or a "step in [the] plot," id. at 710-11, and mailings that are in any way part of the execution of the scheme are sufficient to satisfy the mailing element of the offense. See id. at 713.

Experienced investors such as Mooney expect confirmation slips to confirm their transactions, and Mooney could have anticipated that his buy and sell orders would result in the mailing of confirmation slips. Confirmation slips are integral to an investor's contract relationship with his broker. See United States v. Naftalin, 606 F.2d 809, 811 (8th Cir. 1979). Because the broker's use of the mails is attributable to the investor's buy or sell order, it is sufficient to satisfy the requirement of use of the mails in furtherance of a fraudulent scheme. Id. at 811-12. These slips recorded the sale of Mooney's United stock and the number of call options he purchased and sold, at what price and date, their expiration dates, and details of their sale. The jury could reasonably find that these mailed records aided Mooney in his scheme to defraud. See United States v. O'Hagan, 139 F.3d 641, 652 (8th Cir. 1998). The jury

was entitled to consider the confirmation slips in deciding whether the mails had been used as part of Mooney's fraudulent scheme, and we conclude there was sufficient evidence to satisfy the mailing element of the mail fraud counts.

Mooney also challenges the sufficiency of the evidence for his money laundering convictions under 18 U.S.C. § 1957. Money laundering is defined in the statute as knowingly engaging in, or attempting to engage in, a monetary transaction in criminally derived property that is valued at more than $10,000. Mooney argues that the money laundering counts must fail if the predicate offenses of securities fraud and mail fraud were not established, but as already discussed there was sufficient evidence to support his convictions for those offenses.

Mooney argues that there was insufficient evidence to prove that the funds deposited into his Firstar Bank account were proceeds of insider trading. The evidence showed that the deposits consisted of five withdrawals from the Recom account Mooney used for transactions in United stock. He contends that there was enough United common stock or "clean money" in the account to cover the deposit checks. There was thus insufficient evidence he argues, to show that the deposits were from proceeds of the sale of his call options or "dirty money." The government contends that the issue is unreviewable because Mooney did not raise this commingled funds theory in his motion for acquittal. See United States v. Olano, 507 U.S. 725, 733-34 (1993) (timely assertion necessary to obtain appellate review). The point is well taken, but we note in any event that the government need not trace each dollar to a criminal source to prove a violation of 18 U.S.C. § 1957. See United States v. Hetherington, 256 F.3d 788, 794 (8th Cir. 2001) (citing United States v. Pennington, 168 F.3d 1060, 1066 (8th Cir. 1999)); see also United States v. Ross, 210 F.3d 916, 919-21 (8th Cir. 2000) (same rule adopted for 18 U.S.C. § 1956).

Mooney's theory would allow wrongdoers to evade prosecution for money laundering simply by commingling criminal proceeds with legitimate funds.

Moreover, the jury could reasonably find from the evidence that Mooney was only able to withdraw the funds from his Recom account without going below his margin limit because the account contained the proceeds from the sale of his call options. We conclude that there was sufficient evidence to support Mooney's convictions for illegal monetary transactions.

Mooney also argues that the district court abused its discretion by denying his motion in limine. Before trial he asked the court to rule that his 1986 state tax conviction could not be used to impeach him if he were to testify. The court's denial of the motion caused him not to testify he says, because he feared he would be prejudiced by mention of his conviction in front of the jury. A trial court's evidentiary rulings are generally reviewed for abuse of discretion, see, e.g., United States v. King, 351 F.3d 859, 864 (8th Cir. 2003), but Mooney's issue is unreviewable because he did not testify. See Luce v. United States, 469 U.S. 38, 43 (1984). Nevertheless, the court's decision to allow impeachment by use of his tax conviction was not an abuse of discretion. See United States v. Carter, 528 F.2d 844, 847 (8th Cir. 1975). Mooney has not shown that he is entitled to a new trial.

Mooney's sentencing arguments are directed at the district court's calculation, under § 2B1.4 of the guidelines, of the gain resulting from his offenses. See United States Sentencing Guidelines Manual [U.S.S.G.] § 2B1.4 (2002). He contends that the district court erred in its interpretation of § 2B1.4 and in its finding that the gain from his insider trading was $274,199.46. That amount is the gain Mooney realized by the sale of his United call options for $532,482.49 after purchasing them for $257,283.03. The district court's interpretation and application of the guidelines are reviewed de novo. See United States v. Gonzalez-Lopez, 335 F.3d 793, 795 (8th Cir. 2003). We review the district court's factual findings for clear error. See United States v. Bush, 352 F.3d 1177, 1181 (8th Cir. 2003).

Although Mooney was sentenced on August 21, 2002, the district court applied the 1994 guidelines because those in effect in 2002 would have resulted in a higher sentencing range for the amount of gain found to have resulted from his offenses. See U.S.S.G. § 1B1.11(b)(1) (unless there is an ex post facto problem, the guidelines in effect on the date of sentencing should be used rather than those in effect on the date of the offense); United States v. Reetz, 18 F.3d 595, 597-98 (8th Cir. 1994). Mooney does not challenge the court's use of the 1994 guidelines, and § 2B1.4 is identical in both versions except for the use of gender neutral language in 2002. Compare U.S.S.G. § 2B1.4 (2002) with U.S.S.G. § 2F1.2 (1994) (deleted by consolidation with §§ 2B1.1, 2B1.4 effective Nov. 1, 2001).

The key difference between the 1994 and 2002 guidelines for Mooney's case is in the tables used to find the level of the sentencing enhancement for gain resulting from the offenses. The material difference is that the 2002 guidelines would be more favorable to Mooney if the gain resulting from his offenses is under $70,000, but the 1994 guidelines are more favorable to him if his gain is higher than that.[4] Mooney argues that his gain was only $50,467.47, rather than the $274,199.46 found by the district court. In his briefing he cites to the 2002 manual and its table, which would produce a lower guideline range if his interpretation of § 2B1.4 were adopted. For ease of reference we cite to the 2002 manual, except where the 1994 version would be more beneficial to Mooney.

At sentencing the district court applied the guideline grouping rules which require grouping of offenses which involve substantially the same harm. See U.S.S.G. § 3D1.3. Mooney's securities and mail fraud convictions were grouped

---

[4]Compare U.S.S.G. § 2B1.1(b)(1) (2002) with § 2F1.1(b)(1) (1994). See Reason for Amendment, U.S. Sentencing Guidelines Manual app. C, vol. II, amend. 617 (Nov. 1, 2001) at 179-80 (2003). Other changes in the 2002 guidelines manual included the consolidation and renumbering of certain economic crime sections and a new unitary table for fraud and money laundering offenses.

under U.S.S.G. §§ 3D1.2(b) and (d), since they involved the same criminal objective. They were then grouped with his convictions for laundering the fraudulent proceeds. See U.S.S.G. § 3D1.2(c). Since the money laundering convictions had the highest offense level of the grouped offenses, they supplied the base offense level of 17. See U.S.S.G. § 3D1.3(a). Two levels were added for Mooney's knowledge that the proceeds were from a fraudulent scheme. See U.S.S.G. § 2S1.2(b)(1)(B) (1994).

The final adjustment to Mooney's base offense level was an enhancement of two levels for engaging in monetary transactions involving between $200,000 and $350,000 in illegal proceeds. See U.S.S.G. §§ 2S1.1(b)(2)(C), 2S1.2(b)(2) (1994). This enhancement is the subject of Mooney's sentencing appeal. The illegal proceeds involved in his money laundering were those derived from his insider trading offenses, and the district court found the gain from those offenses to be $274,199.46 under U.S.S.G. § 2B1.4. With a total offense level of 21 and a criminal history score of I, Mooney's sentencing range was 37 - 46 months. The court sentenced him in the middle of the range to 42 months.

The district court found that the gain resulting from Mooney's offenses was the total amount he gained from his illegal purchase and sale of United call options, but Mooney argues his gain should not be determined from the proceeds he received on their sale. The formula he urges would use instead the increase in the market value of the call options in the period before his inside information became public and was absorbed by the market. Mooney claims that the market would have reasonably absorbed his inside information by June 28, just two days after United announced its Metra acquisition, and that the information would have been reflected in the market value of his call options on that date. His brief puts that value at $309,750,[5] from which he subtracts the purchase price of $258,283.03 to arrive at a gain figure of $50,467.47. The proceeds of the sales in July and October should not be a factor he

_____

[5]This appears to be a typographical error; we assume $308,750 is intended.

says because the sales occurred after June 28, his estimated date for absorption of the inside information into the market. His proposed gain figure would result in a sentencing range of 24 - 30 months.

Mooney argues that the sentencing guideline term "gain resulting from the offense" is not clear and that a market absorption approach should be borrowed from civil insider trading cases to interpret the guideline. Cf. 15 U.S.C. § 78u-1(f) (using trading price of the security a reasonable period after public dissemination of the nonpublic information). He points to SEC v. MacDonald, 699 F.2d 47, 53-55 (1st Cir. 1983) (en banc), a civil case holding that defrauded sellers could recover the amount they lost before they could have reasonably obtained access to the material nonpublic information. He neglects to mention that the MacDonald court characterized this damages formula for defrauded investors as remedial in nature, and that the court contrasted it to the punitive nature of criminal penalties. Id. at 54; see also id. at 55 (Coffin, C.J., dissenting). Accord United States v. Perry, 152 F.3d 900, 903-04 (8th Cir. 1998) (disgorgement is a civil sanction serving nonpunitive goals).[6]

The government responds that the district court did not err by focusing on the amount of gain which Mooney realized from his fraudulent transactions. It notes that the official commentary for the insider trading guideline expressly disapproves of any attempt to measure the severity of the offense in terms of victim losses, and it says that different standards are intended for the criminal sentencing guidelines than for civil disgorgement actions. In the civil context the amount to be disgorged is limited to victim losses because using total gain could result in an unjust windfall for private victims. The government points out that Mooney's proposed standard to measure gain is inherently speculative and would require the sentencing court to identify the

---

[6]The SEC's civil fraud case against Mooney was stayed when the United States decided to charge him with criminal fraud and money laundering; his formula for gain in this criminal case would apply the same type of disgorgement remedy sought in the SEC's civil case.

point at which material nonpublic information is fully assimilated by the market. That would involve extensive factfinding, and in the present case it would be difficult to say when, if ever, the market had fully assimilated all of the nonpublic information Mooney possessed.

Mooney cites no support in the guidelines or in judicial decisions for incorporating civil law standards into the relevant guideline. The criminal cases he does cite were decided before the Sentencing Reform Act introduced guideline sentencing, and they are inapposite: Chiarella v. United States, 445 U.S. 222 (1980) (construing §10b-5 disclosure requirements); United States v. Boyer, 694 F.2d 58, 60 (3d Cir. 1982) (construing scienter requirements); United States v. Charnay, 537 F.2d 341, 348 (9th Cir. 1976) (indictment sufficiently charged the elements of § 10b-5 violation).

In interpreting the guidelines, we start with the plain language of the guideline itself. See Gonzalez-Lopez, 335 F.3d at 797. Section 2B1.4 and its phrase "gain resulting from the offense" are simple and straightforward. The guideline phrase refers to the gain that has resulted from the defendant's offense. It refers to the defendant's gain, not to market gain, and it ties gain to the defendant's offense. It speaks of gain that has resulted, not of potential gain. The guideline does not say "the gain in market value that has resulted from the offense"; such a phrase might support Mooney's theory, but that is not the language used. Any question about the guideline's meaning, however, is decisively resolved by the authoritative definition provided in the commentary to § 2B1.4.

The official commentary to § 2B1.4 makes the meaning of the guideline very clear. The commentary defines gain resulting from insider trading in this way:

> This guideline applies to certain violations of Rule 10b-5 that are commonly referred to as "insider trading." Insider trading is treated essentially as a sophisticated fraud. Because the victims and their losses

are difficult if not impossible to identify, <u>the gain, i.e., the total increase in value realized through trading in securities by the defendant</u> and persons acting in concert with the defendant or to whom the defendant provided inside information, is employed instead of the victims' losses.

U.S.S.G. § 2B1.4, cmt. background (2002) (emphasis added).

In explaining what is meant by the defendant's gain and why it is used for sentencing inside trading offenses, the commentary specifically rejects using victim losses in the calculation. The guideline employs the concept of gain resulting from the offense as an alternative measure of loss because of the difficulty of ascertaining the victims and their losses for such offenses. <u>See</u> U.S.S.G. §§ 2B1.1 cmt. n.2(B), 2B1.4 cmt. background. It thus rejects the kind of remedy in <u>SEC v. MacDonald</u> and the civil securities laws which are based on victim losses rather than the defendant's gain.

The commentary focuses on "the total increase in value <u>realized</u> through trading in securities by the defendant" (emphasis added). That is the commentary's definition of gain, and it uses common words with widely understood meanings. There is nothing difficult about the terms "total increase in value" or "trading in securities." Words are to be taken in their ordinary meaning unless they are technical terms or words of art. <u>Cf.</u> <u>Salinas v. United States</u>, 522 U.S. 52, 63 (1997) ("When Congress uses well-settled terminology of criminal law, its words are presumed to have their ordinary meaning and definition.").

"Realized" is a key word in the commentary definition of gain. In the context of securities transactions, to realize means to convert securities or paper money into cash. <u>See</u> Oxford English Dictionary (2d ed. 1989). To realize is commonly used to mean "to bring in (a sum) as profit by sale," <u>see</u> American Heritage Dictionary (4th ed. 2000), and "to convert into actual money; as, to realize assets." <u>See</u> Webster's Revised Unabridged Dictionary (1998). The ordinary meaning of the word is also

-15-

used in the tax context where to realize a gain in the value of property, the taxpayer "must engage in a 'sale or other disposition of [the] property.'" Cottage Sav. Ass'n v. Comm'r, 499 U.S. 554, 559 (1991) (citing Treas. Reg. § 1001(a)). By use of the word "realized" the commentary makes clear that gain is the total profit actually made through a defendant's illegal securities transactions. As applied to this case, it means that the gain resulting from Mooney's offenses was the amount he actually realized by his trading in call options while he possessed material inside information. In other words, his gain was the profit he realized when he received $532,482.49 for sale of the call options he had purchased for $258,283.03.

The guideline commentary is binding on federal courts, see Stinson v. United States, 508 U.S. 36, 42 (1993), and the guidelines themselves indicate that the purpose of the accompanying commentary is to interpret the guideline and to explain how it is to be applied. See U.S.S.G. § 1B1.7. The Supreme Court pointed out in Stinson that the commentary accompanying the guidelines not only explains them, but it "provides concrete guidance as to how even unambiguous guidelines are to be applied in practice." 508 U.S. at 44. Not only is the commentary "an authoritative guide to the meaning" of a guideline, id. at 42 (citing Williams v. United States, 503 U.S. 193, 201 (1992)), but the "failure to follow interpretive and explanatory commentary could result in reversible error." Id. at 47. The commentary to § 2B1.4 is clear and consistent and must be given controlling weight. See United States v. Hendricks, 171 F.3d 1184, 1186 (8th Cir. 1999). Stinson teaches that we are not free to ignore the definition in the commentary or to create our own definition of gain, and Mooney's theory borrowed from the civil law cannot be substituted for the authoritative guidance of the commentary.[7]

_____

[7]Mooney's argument that his interpretation should be adopted under the rule of lenity is thus without merit. See United States v. Oetken, 241 F.3d 1057, 1060 (8th Cir. 2001).

Since the governing guideline does not measure gain by increase in unrealized value, Mooney cannot prevail with his argument that his gain should be interpreted to be the paper increase in the value of his call options as of June 28, and there are good policy reasons for this. Using actual sales to calculate gain provides a clear and coherent brightline rule, eliminating the need for extensive factfinding to try to determine when the market has absorbed nonpublic information. See SEC v. MacDonald, 725 F.2d 9, 11 n.2 (1st Cir. 1984) (per curiam) ("determinations of this type are more an art than a science, dependent upon a mix of factors for which there are no precise standards or guidelines"). Imprecise standards are particularly inappropriate in the criminal context, and Mooney's approach would be especially difficult in this case. Mooney's use of June 28 as the date he claims the market would have absorbed the inside information is most problematic given the evidence in the record. Because Metra was privately held and much information about it was not publicly available, it is questionable how quickly the stock market could learn and absorb material information about the value of United's acquisition.[8] The guideline's focus on the increase in value realized by the defendant's trades provides a simple, accurate, and predictable rule for judges to apply and follows the Congressional mandate that sentences reflect the seriousness of the offense. See 18 U.S.C. § 3553; 28 U.S.C. § 991. We conclude that the district court correctly interpreted and applied § 2B1.4.

Mooney also makes an additional argument that he actually made no gain from his offenses. His zero gain theory is based on the argument that he sold the 20,000 shares of United stock on May 17 because he had received a margin call rather than

_____

[8]Regulatory approval for the $1.65 billion acquisition was not obtained until September 29, the acquisition was not completed until October 3, 1995, and market analysis of the acquisition continued into the fall of 1995. Paine Webber released its report "Implications of the MetraHealth Acquisition, Corporate Metamorphosis," in August, and Piper Jaffray issued "Reshaping the Delivery of Healthcare in America—An Analysis of the MetraHealth Acquisition" in October 1995.

because of a fraudulent scheme, that the margin call forced him to sell the shares at a lower price than their market value on April 13 when he had exercised his employee options to purchase the stock, and that the difference in market value on those dates should have been deducted from the profit he made through his purchase and sale of call options.  By substituting his gain figure of $50,467.47 for the district court's finding that he gained $274,199.46 by his insider trading, and then deducting the $142,000 difference in market value of United stock on the two dates, he arrives at a zero gain and a sentencing range of 8 - 14 months.

Mooney's zero gain theory is without foundation for it lacks factual support in the record.  He did not lose $142,000 by his sale of the 20,000 shares.   He actually made a large profit on the sale.  He sold the 20,000 shares on May 17 for $775,500, after paying only $36,000 for them by exercising his employee options on April 13. He did not have to pay the market price for his shares, and he did not sell them when their market value was $917,500.  He sold them after the Virginia meetings at Metra were concluded, at a time when their market value was lower than in April.  The evidence does not support Mooney's contention that he was forced to sell his stock in response to a margin call.  The evidence showed that Mooney made arrangements to sell the 20,000 shares as soon as he returned from the Metra due diligence meetings, that his Recom account had no margin problem at that time, and that he never received a margin call.  The record also showed that as soon as his sale of the 20,000 shares cleared on May 24, he began to purchase United call options with the proceeds of the sale.  There was more than sufficient evidence from which the trier of fact could find that he sold his stock in order to carry out his fraudulent scheme — to profit from transactions in United call options by using insider information.

Mooney cites no authority to support his theory that he should be credited with an unrealized loss, and the guidelines do not provide for any such credit.  Section 2B1.4 focuses on realized value actually gained by the defendant through insider trading, not on differences in market value that did not result in actual gain or loss.

In insider trading a defendant's gain from the offense is used in the guidelines to approximate victim losses, and costs to carry out the defendant's fraudulent scheme have no effect on the amount lost by market victims. Furthermore, the law does not favor crediting a defendant for the costs involved in his fraudulent scheme. See United States v. Whatley, 133 F.3d 601, 606 (8th Cir. 1998) ("[W]e are not inclined to allow the defendants a profit for defrauding people or a credit for money spent perpetuating a fraud."). Accord United States v. Frank, 354 F.3d 910, 928 (8th Cir. 2004); United States v. Blitz, 151 F.3d 1002, 1012 (9th Cir. 1998). The district court did not err by declining to make the requested deduction.

Almost immediately after the Supreme Court's recent decision in Blakely v. Washington, 542 U.S. ___ (2004), 2004 WL 1402697 (June 24, 2004), Mooney filed three documents related to his sentence. The first was his third motion for release pending appeal, which argues that there is "a significant likelihood that [he] will be forced to serve an unjust sentence" because the district court's finding of gain raised his guidelines range and his "correct sentence may be 24 - 30 months." Several days later he filed a 28(j) letter referencing Blakely and saying that he had already served more time than he should have and that his sentence cannot now be upheld because it was based on a finding of "fraud loss" [sic] made by the judge, rather than by a jury. On the same day he moved for supplemental briefing in light of Blakely.

The government responded to the motion for release by arguing that Blakely does not undercut Mooney's sentence because the Court majority expressly stated in its footnote 9 that it was expressing no opinion as to the federal sentencing guidelines and because existing precedent permits a guideline enhancement based on facts not charged or proven to a jury, citing Edwards v. United States, 523 U.S. 511, 514-15 (1998), among other Supreme Court cases. It also contends that Mooney's 42 month sentence should be upheld because it lies between the statutory maximum and minimum.

-19-

Since his case is still on direct appeal, Mooney is clearly entitled to raise the sentencing argument he advances under Blakely. See Griffith v. Kentucky, 479 U.S. 314, 328 (1987). Mooney's 28(j) filing argued that the issue of the amount of gain resulting from his offense should have been submitted to the jury under Blakely. While it did not question the constitutionality of the federal sentencing guideline system, that issue was raised in the government's response to Mooney's recent motion for release from imprisonment. Until today our court has not taken a position on whether Blakely applies to the federal sentencing guidelines or whether it makes the guideline system unconstitutional, but many other circuits have. See, e.g., In re Dean, 2004 WL 1534788 (11th Cir. July 9, 2004) (Supreme Court has not spoken to federal guidelines; declined to apply Blakely retroactively on collateral review); United States v. Booker, 2004 WL 1535858 (7th Cir. July 9, 2004) (2-1) (application of the guidelines violated the Sixth Amendment as interpreted by Blakely); United States v. Pineiro, 2004 WL 1543170 (5th Cir. July 12, 2004) (declined to apply Blakely to the federal guidelines; affirmed sentence imposed on judge found facts); United States v. Penaranda, 2004 WL 1551369 (2d Cir. July 12, 2004) (en banc) (recognized ambiguities within Blakely and certified three questions to the Supreme Court about possible application to the federal guidelines and judicial fact finding); United States v. Montgomery, 2004 WL 1562904 (6th Cir. July 14, 2004) (Blakely made mandatory guidelines unconstitutional), vacated and reh'g en banc granted July 19, 2004.

Since Mooney began serving his sentence on October 2, 2002, there is good reason for his motion for release to be heard as soon as possible, and the district court would be in the better position to hear that motion expeditiously and to consider any possible conditions of release. Since the merits of Mooney's sentencing issue under Blakely are tied up with the standard for granting a motion for release pending appeal, see 18 U.S.C. § 3143(b), the most efficient way to proceed would be to remand that issue also. The district court will then be able to order supplemental briefing on the application of Blakely to Mooney's sentence and to develop the record for final resolution of the issue. It is not clear from the record before us, for example,

whether Mooney asked the district court at trial to submit the issue of gain to the jury or not.[9] If he did, appellate review on that issue would not be confined to a plain error standard. See Johnson v. United States, 520 U.S. 461, 467 (1997); United States v. McKinney, 120 F.3d 132, 134-35 (8th Cir. 1997).

Our panel is united in the decision to remand the sentencing issue in this case for further consideration in light of Blakely, but divided on the issue of its proper interpretation. Judges Lay and Bright hold for the court that the federal sentencing guidelines are unconstitutional under Blakely, while the author of this opinion dissents and would hold that Blakely did not address or decide that issue and that it did not overrule existing Supreme Court precedent upholding the guidelines. In the interest of expediting consideration of the particular circumstances of Mooney's case, we attach brief separate opinions on the application of Blakely.

In summary, we conclude that Mooney is not entitled to prevail on any of his arguments for judgment of acquittal or new trial and we affirm his conviction. The district court did not err in its interpretation of gain resulting from the offense under U.S.S.G. § 2B1.4, but we remand Mooney's sentence to the district court for consideration of the issue he raises under Blakely v. Washington. Since Mooney began serving his sentence on October 2, 2002, the district court should schedule an expedited hearing on the sentencing issue and on his third motion for release which we remand by separate order. The panel will retain jurisdiction in the event of any further appeal.

---

[9]Although no fact issue on the gain resulting from Mooney's offense was submitted to the jury, the basis for his other sentencing enhancement was. In respect to one of the money laundering counts, the jury made a finding beyond a reasonable doubt that Mooney had knowledge that the money involved was derived from his fraudulent scheme. Mooney has never raised any issue about this enhancement on his appeal or in his recent submissions.

-21-

LAY and BRIGHT, Circuit Judges, join in this additional opinion for the Court.

We concur with Judge Murphy in the result of remanding this case for resentencing in light of <u>Blakely v. Washington</u>, 542 U.S. __, 2004 U.S. LEXIS 4573 (June 24, 2004). We briefly state our views and the consequences for resentencing.

No party disputes that Mooney received enhancements or increases to his sentence based on facts found by a judge by a preponderance of the evidence. Neither does any party suggest that the Guidelines did not require the district court to employ those enhancements, once it found the underlying facts. Finally, no party disputes that the enhancements increased the maximum sentence Mooney could have received under the Guidelines if he had been sentenced without judge-found facts. Therefore, the sentencing proceedings in the district court violated Mooney's Sixth Amendment right to have a jury find beyond a reasonable doubt any and all facts legally necessary to his sentence. <u>See</u> <u>Blakely</u>, 2004 U.S. LEXIS 4573 at *14 ("When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts 'which the law makes essential to the punishment,' and the judge exceeds his proper authority." (internal citation omitted)). In the absence of the defendant's consent to sentencing under the Guidelines, his sentence here becomes unconstitutional. The logic of <u>Blakely</u> renders Mooney's sentence a violation of his Sixth Amendment rights to an impartial jury trial. <u>See</u> U.S. Const., Amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ."). We are aware of the Fifth Circuit opinion to the contrary in <u>United States v. Pineiro</u>, 2004 U.S. App. LEXIS 14259 (5th Cir. July 12, 2004) (holding that <u>Blakely</u> does not apply to the federal Guidelines), but we are far more persuaded by the thorough and logical opinion of Judge Posner in <u>United States v. Booker</u>, 2004 U.S. App. LEXIS 14223 (7th Cir. July 9, 2004) (holding that <u>Blakely</u> does apply to the federal Guidelines),[10] and the recently vacated opinion of Judge

<hr/>

[10]<u>Accord</u> <u>United States v. Ameline</u>, 2004 U.S. App. LEXIS 15031 (9th Cir. July 21, 2004) (holding that <u>Blakely</u> applies to the federal guidelines but determining that

-22-

Merritt in <u>United States v. Montgomery</u>, 2004 U.S. App. LEXIS 14384 (6th Cir. July 14, 2004), <u>vacated and reh'g en banc granted</u> July 19, 2004. <u>Booker</u> and the panel opinion in <u>Montgomery</u> well illustrate that the Supreme Court has never, before <u>Blakely</u>, directly held whether judicial fact-finding under determinate sentencing schemes like the Guidelines violate a defendant's right to trial by jury under the Sixth Amendment of the United States Constitution. All previous cases upholding enforcement of the Guidelines considered separate issues unrelated to the issue resolved by <u>Blakely</u>. Certainly, defendants have no weaker rights under the Sixth Amendment against the federal government than they do against the States.

A variety of potential remedies have circulated within the courts. The district courts in this Circuit have an urgent need for clarification. To that end, we adopt the careful and wise remedy of Judge Cassell, announced in <u>United States v. Croxford</u>, 2004 U.S. Dist. LEXIS 12156 (D. Utah June 29, 2004) (holding the Guidelines wholly unconstitutional and granting the sentencing court the exercise of discretion within the statutory maxima and minima, using the Guidelines as advisory but not necessarily binding). <u>See also</u> <u>United States v. Croxford</u>, No. 2:02-CR-00302-PGC, 2004 U.S. Dist. LEXIS 12825 (D. Utah July 12, 2004) (refuting the Government's arguments that <u>Blakely</u> does not apply to the Guidelines). We also agree with Judge Sachs in <u>United States v. Lamoreaux</u>, 2004 U.S. Dist. LEXIS 13225 (W.D. Mo. July 7, 2004) that the Guidelines were designed as an integrated regime, and therefore cannot be severed into constitutional and unconstitutional parts while still remaining true to the legislative purpose. We observe that this result is also consistent with the Government's proposed solution (if we held the Guidelines unconstitutional, as we do today). <u>See</u> Response to Mot. for Release Pending App., <u>passim</u> (arguing that if the Guidelines are unconstitutional, they are unseverable).

---

the guidelines are severable and remanding for the possible convening of a sentencing jury).

On remand, we direct the district court to follow Judge Cassell's procedure of treating the Guidelines as <u>non-binding</u> but advisory, unless the defendant consents to a Guidelines sentence. The district court shall exercise its sound discretion to resentence Mooney within the statutory minima and maxima of the offenses for which he was convicted.[11]

MURPHY, Circuit Judge, dissenting from the decision to declare the federal sentencing guidelines unconstitutional.

I dissent from the majority's decision to declare the federal sentencing guidelines unconstitutional. The Supreme Court did not hold all determinate sentencing schemes unconstitutional in <u>Blakely</u>, 125 S. Ct. at 2540, and it did not address the constitutionality of the federal sentencing guidelines. <u>Id.</u> at 2538 n.9. This court should not rush to judgment on that issue, particularly in a case where it has not been thoroughly briefed and the appellant has only raised a narrower question.

The Supreme Court has instructed lower courts to follow its existing precedent until the Court has overrruled it, even if the reasoning of that precedent has been questioned in a subsequent case. <u>See, e.g.</u>, <u>State Oil Co. v. Kahn</u>, 522 U.S. 3, 20 (1997); <u>Agostini v. Felton</u>, 521 U.S. 203, 237 (1997); <u>Rodriguez de Quijas v. Shearson/American Express, Inc.</u>, 490 U.S. 477, 484 (1989). It is the Court's prerogative to overrule its own decisions, <u>State Oil Co.</u>, 522 U.S. at 20, and lower courts "are obligated to follow what the Supreme Court *has said*, not guess what it

---

[11]Both of Mooney's enhancements, for gain and for knowledge, are subject to reconsideration by the district court. The record is unclear on whether the elements of the knowledge enhancement for sentencing purposes were, in this case, proven to the jury beyond a reasonable doubt as part of the charged offenses. However, our holding that the Guidelines are entirely unconstitutional means that the knowledge enhancement itself can be at most persuasive to the district court.

*might* say in the future." United States v. Maynie, 257 F.3d 908, 918 (8th Cir. 2001) (emphasis in original).

In each of its decisions dealing with the federal sentencing guidelines, the Supreme Court has upheld their constitutionality, beginning with Mistretta v. United States, 488 U.S. 361 (1991) (Congress did not violate separation of powers principle or excessively delegate legislative authority to the Sentencing Commission).[12] See, e.g., Stinson v. United States, 508 U.S. 36, 42 (1993) (courts are bound by the guidelines and the accompanying policy statements and commentary); Witte v. United States, 515 U.S. 389, 399-401 (1995) (guideline use of uncharged conduct does not constitute double jeopardy); United States v. Watts, 519 U.S. 148, 157 (1997) (per curiam) (guideline sentence may be enhanced by a judge based on charges acquitted by a jury); Edwards v. United States, 523 U.S. 511, 514-15 (1998) (guideline sentence may be based on conduct found by a judge rather than a jury).

Although the Supreme Court might well apply the Sixth Amendment rationale underlying Blakely to the federal sentencing system in a future case, we cannot know exactly how the Supreme Court would choose to apply it. Indeed, the multitude of lower court decisions which have already applied Blakely to the federal system illustrate some of the many alternatives the Supreme Court might consider. Must factfinding which raises a sentence above a guideline range, created not by statute but by an independent body within the judicial branch, be done by a jury? Is some aspect of the federal guidelines unconstitutional? Would any infirmity be severable or is the whole guideline system unconstitutional? If so, may judges use their discretion to sentence at any point below the statutory maximum? Or are they to use the guidelines

_____

[12]A not irrelevant cite to Mistretta by one of the five justices in the Blakely majority was made in a concurring statement in Apprendi v. New Jersey, 530 U.S. 466, 523 n.11 (2000), the case upon which Blakely rests. There, Justice Thomas noted that the Court did not need to consider the applicability of its rule to the federal sentencing guidelines "given the unique status that they have under Mistretta."

as advisory but not binding, as our majority holds? Must all relevant sentencing factors be charged in an indictment and proved to a jury beyond a reasonable doubt? Should the defendant's Sixth Amendment right be ensured by use of a bifurcated trial or a separate sentencing jury? And so on.

The rule that lower courts should follow Supreme Court precedent until it is clearly overruled by the Court is especially prudential in an area like sentencing, where the legislative and executive branches also have keen interest and active involvement. The many conflicting decisions around the country applying Blakely in different ways are creating wide sentencing disparity, and prevention of such disparity was a major policy reason behind the Sentencing Reform Act and the creation of the federal sentencing guidelines. See, e.g., 28 U.S.C. § 991(b)(1)(B) (Congress wanted to "provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities"). Individual sentencing systems undermine the expressed legislative interest in providing predictability, uniformity, and fairness in federal criminal sentencing.

The Supreme Court may decide to end the uncertainty about sentencing at an early date, perhaps by granting the Second Circuit's certification request in United States v. Penaranda, 2004 WL 1551369 (2d Cir. July 12, 2004) (en banc), or by granting the certiorari petitions of the United States in United States v. Booker, 2004 WL 1535858 (7th Cir. July 9, 2004) petition for cert. filed July 21, 2004 (No. 04-104), and United States v. Fanfan, No. 03-00047 (D. Me. June 30, 2004) petition for cert. filed July 21, 2004 (No. 04-105). It is also worthy of note that the United States Senate passed a unanimous resolution on July 21, 2004 urging the Court to "act expeditiously to resolve the current confusion and inconsistency in the Federal criminal justice system." S. Con. Res. 130, 108th Cong. (2004). Our court need not create its own new constitutional rule in the interim, and it should not.

For these reasons I respectfully dissent.

BRIGHT, Circuit Judge, dissenting in part.

The majority's interpretation of U.S.S.G. § 2B1.4 may well end up as an advisory opinion, given our holding today that the Guidelines are unconstitutional. However, because the Guidelines may retain limited utility as guidance for sentencing judges exercising their discretion, I respectfully dissent on this issue.

The plain language of the Guideline, the language of the commentary, caselaw and common sense uniformly suggest that Mooney's gain should not depend on the vagaries of the market when he happened to sell his stock. The Guideline itself says, "If the gain resulting from the offense exceeded $5,000, increase [the offense level] . . . ." U.S.S.G. § 2B1.4(b)(1) (emphasis added). Upswings in the price of Mooney's securities that occurred after the market fully accounted for the merger news cannot plausibly "result[] from the offense" for which Mooney was convicted; that extra gain has nothing to do with the merger news. When Mooney actually sold his securities, all investors knew of the merger and market forces beyond Mooney's knowledge dictated the market price from day to day. Mooney's sentence should only receive the gain enhancement for "the total increase in value realized through trading in securities," U.S.S.G. § 2B1.4, cmt. background (emphasis added), but gain derived after the public properly priced the merger news did not accrue to Mooney through his insider trading. Mooney's punishment should be based on his crime, not subsequent economic events over which he had no influence.

Mooney's argument that his gain should be calculated the same way it would be in a civil enforcement action shows, at the very least, that a calculation based on the gain in market price when the public learned of the merger would not be impracticable. The civil case upon which Mooney relies, SEC v. McDonald, 699 F.2d 47 (1st Cir. 1983) (en banc), is the only analogous precedent cited for either side. The majority's view of how the district court should calculate gain is utterly unsupported by even a single case.

Finally, because this Court holds the Guidelines unconstitutional and directs the district court to reconsider Mooney's sentence within its sound discretion, the district court appears free to consider the above discussion of gain in exercising that discretion. Accordingly, I respectfully dissent from the majority's construction of U.S.S.G. 2B1.4.

_____